1   **WO**

2

3

4

5

6            **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

John Edward Sansing,         )   No. CV-11-1035-PHX-SRB

9                           )

         Petitioner,        )   <u>DEATH PENALTY CASE</u>

10                           )

vs.                          )

11                           )

                          )   **MEMORANDUM OF DECISION**

12 Charles L. Ryan et al.,       )   **AND ORDER**

                          )

13         Respondents.      )

                          )

14 _____)

15

16        Petitioner John Edward Sansing, a state prisoner under sentence of death, has filed a

17 Petition for Writ of Habeas Corpus alleging that he is imprisoned and sentenced in violation

of the United States Constitution. (Doc. 35.)[1] The petition raises 29 claims. Pursuant to the

18 Court's general procedures governing resolution of capital habeas proceedings, the parties

19 have briefed both the procedural status and merits of Petitioner's claims. (Docs. 37, 51.)

20 Petitioner has also filed a Motion for Evidentiary Development regarding four of his claims.

21 (Doc. 53.) As set forth below, the Court concludes that Petitioner is not entitled to either

22 evidentiary development or federal habeas relief.

23                             **<u>BACKGROUND</u>**

24      _____

25        [1] "Doc." refers to the documents in this Court's Electronic Case File (ECF). "RT"

26 refers to reporter's transcript; "ROA" refers to the trial court record prepared for Petitioner's
direct appeal (Case No. CR-99-0438-AP). The original reporter's transcripts and a certified

27 paper copy of the record on appeal were provided to this Court by the Arizona Supreme
Court. (Doc. 63.) Additional state court records have been filed electronically by the parties.

28 (Docs. 37-44, 46, 52.) Citation to these records is to the ECF docket and page number.

1    In September 1998, Petitioner pled guilty to the first-degree murder, kidnapping,

2  armed robbery, and sexual assault of Trudy Calabrese.   The Arizona Supreme Court

3  summarized the facts as follows:

4          On February 24, 1998, the defendant called the Living Springs Church
     and requested delivery of a food box for his family. He gave the church
5     secretary his name and home address for the delivery. The defendant then
     telephoned his wife, Kara Sansing, at work several times, primarily to discuss
6     how to obtain more crack cocaine for the two of them to smoke. During these
     calls, the defendant informed his wife that he had obtained some crack
7     cocaine, that he had smoked some of it and was saving the rest for her. He also
     told her that he had called a church and arranged for delivery of some food.
8     When Kara Sansing returned home at approximately 3:20 p.m., the couple
     smoked the remaining crack cocaine. The defendant, in the presence of his
9     four children, informed Kara of his plan to rob the person who came from the
     church with the food boxes so he could purchase more crack cocaine.
10
             Trudy Calabrese left the Living Springs Church in her truck at
11     approximately 4:00 p.m. She arrived at the Sansing home shortly thereafter,
     parked in front of the house, and delivered two boxes of food. Ms. Calabrese
12     chatted with Kara Sansing in the kitchen while the defendant signed a receipt
     for the delivery. Before Ms. Calabrese could leave, the defendant grabbed her
13     from behind and drew her to the dining room floor. Aided by his wife and
     with his children watching, the defendant bound her wrists while she cried,
14     "Lord, please help me" and, "I don't want to die, but if this is the way you
     want me to come home, I am ready," and repeatedly asked the defendant's
15     children to call the police. The defendant instructed his children to go into the
     living room and watch television.
16
             Using a club, the defendant struck Ms. Calabrese in the head several
17     times with force sufficient to break the club into two pieces and render her
     temporarily unconscious. Leaving her on the dining room floor, the defendant
18     took her keys and moved her truck to a business parking lot nearby. At some
     point before he returned, Ms. Calabrese regained consciousness. Upon his
19     return, the defendant dragged her into his bedroom and sexually assaulted her.
     Kara Sansing, who witnessed the rape, testified that she heard the defendant
20     and Ms. Calabrese speaking during the rape. The defendant then fatally
     stabbed her in the abdomen three times with a kitchen knife. During the attack,
21     the defendant placed a sock in Ms. Calabrese's mouth and secured two plastic
     bags over her head with additional cords and a necktie. According to the
22     medical examiner, she lived several minutes after being stabbed. After the
     murder, the defendant left the bedroom and went to look out the dining room
23     window to make certain no one had observed his actions.

24             The defendant then removed Ms. Calabrese's jewelry and left her body
     in his bedroom, covered with laundry, for several hours. The defendant
25     engaged in two separate drug transactions shortly after the murder. First, he
     telephoned a drug dealer and arranged to trade the victim's rings for crack
26     cocaine. Later, he arranged to trade her necklace for more crack cocaine.

27             Later in the evening, Pastor Becker from Living Springs Church called
     the Sansing home looking for Ms. Calabrese and spoke to the defendant. The
28     defendant, giving a false address, told the pastor that she had never arrived.

- 2 -

1

2          Late that night, the defendant dragged Ms. Calabrese from the bedroom
    to the backyard and placed her body in a narrow space between the back of his
3   shed and the fence. He covered her with a piece of old carpeting and other
    debris. At least three of the four Sansing children saw the body behind the
4   shed. At some point, the defendant washed the bloody club and hid the clothes
    he had used to cover her body in a box in the bedroom.

5          The next day, searchers found Ms. Calabrese's truck in a parking lot
6   near the Sansing home. Inside, they found a piece of paper with the Sansings'
    correct address. The police went to the Sansing home and discovered the
7   victim's body behind the shed. The defendant, who had driven to his sister's
    house, admitted to her that he and his wife had killed Ms. Calabrese.
8   Eventually, the defendant's father telephoned the police and reported the
    defendant's location. The defendant knew the police were coming and did not
9   attempt to flee. When the police arrived, he submitted to custody peaceably
    and without resistance.

10  *State v. Sansing*, 200 Ariz. 347, 351-52, 26 P.3d 1118, 1122-23 (2001) (*Sansing I*).

11          In September 1999, Maricopa County Superior Court Judge Ronald S. Reinstein held

12  a sentencing hearing to determine the existence of aggravating and mitigating circumstances.

13  The court found that the State had proven beyond a reasonable doubt that Petitioner

14  committed the crime in the expectation of pecuniary gain, A.R.S. § 13-703(F)(5),[2] and that

15  Petitioner committed the murder in an especially cruel, heinous, or depraved manner, A.R.S.

16  § 13-703(F)(6). The court further found that Petitioner had failed to prove any statutory

17  mitigating circumstances under A.R.S. § 13-703(G), but that he had established five non-

18  statutory mitigating circumstances: (1) impairment from the use of crack cocaine; (2) a

19  difficult childhood; (3) acceptance of responsibility and remorse; (4) lack of education; and

20  (5) family support. Weighing the sentencing factors, the court determined that the proven

21  mitigation was not sufficiently substantial to outweigh the aggravation and sentenced

22  Petitioner to death.

23          On appeal, the Arizona Supreme Court struck the pecuniary gain aggravating factor

24  but nonetheless affirmed. *Sansing I*, 200 Ariz. at 355-56, 26 P.3d at 1126-27. Subsequently,

25  the United States Supreme Court decided *Ring v. Arizona*, 536 U.S. 584 (2002), holding that

26

27  ─────────────────

28      [2]  Section 13-703 has since been transferred and renumbered as A.R.S. § 13-751
    (2011).

- 3 -

1    Arizona's aggravating factors are an element of the offense of capital murder and therefore

2    must be found by a jury. The Court granted Petitioner's petition for certiorari, vacated the

3    Arizona Supreme Court's judgment, and remanded for further consideration in light of *Ring*.

4    *Sansing v. Arizona*, 536 U.S. 954 (2002) (mem.). On remand, the state court determined that

5    the lack of jury findings as to aggravation constituted harmless error in Petitioner's case.

6    *State v. Sansing*, 206 Ariz. 232, 77 P.3d 30 (2003) (*Sansing II*). The Supreme Court denied

7    a petition for certiorari. *Sansing v. Arizona*, 542 U.S. 939 (2004).

8         Petitioner then sought post-conviction relief in state court, raising six claims for relief.

9    In July 2008, the trial court dismissed five of the claims as meritless or procedurally

10   precluded. It held a four-day evidentiary hearing on the remaining claim, which alleged

11   ineffective assistance of counsel at sentencing, and ultimately denied relief in July 2010. The

12   Arizona Supreme Court summarily denied a petition for review in May 2011, and Petitioner

13   thereafter initiated these habeas corpus proceedings.[3]

14                                     **APPLICABLE LAW**

15        Because it was filed after April 24, 1996, this case is governed by the Antiterrorism

16   and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA). *Lindh v. Murphy*, 521

17   U.S. 320, 336 (1997); *see also Woodford v. Garceau*, 538 U.S. 202, 210 (2003). The

18   following provisions of the AEDPA will guide the Court's consideration of Petitioner's

19   claims.

20   **I.      Principles of Exhaustion and Procedural Default**

21        Under the AEDPA, a writ of habeas corpus cannot be granted unless it appears that

22   the petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see*

23   *also Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v. Lundy*, 455 U.S. 509 (1982).

24   _____

25        [3]  Petitioner complains that he was directed to file his habeas petition prior to
26   expiration of the statute of limitations under 28 U.S.C. § 2244(d) and that he therefore
     "reserves the right to amend this petition any time before the one year statutory deadline
27   expires without being required to meet the strict requirements for amendment imposed by
     *Mayle v. Felix*, 545 U.S. 657." (Doc. 35 at 10.) Because Petitioner did not seek to amend
28   his petition, either before expiration of the limitations period or after, this issue is moot.

To exhaust state remedies, the petitioner must "fairly present" his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative facts and the federal legal theory on which his claim is based so that the state courts have a fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim. *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971). Unless the petitioner clearly alerts the state court that he is alleging a specific federal constitutional violation, he has not fairly presented the claim. *See Casey v. Moore*, 386 F.3d 896, 913 (9th Cir. 2004). A petitioner must make the federal basis of a claim explicit either by citing specific provisions of federal law or federal case law, even if the federal basis of a claim is "self-evident," *Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999), or by citing state cases that explicitly analyze the same federal constitutional claim, *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003) (en banc).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and post-conviction relief (PCR) proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims

1  in order to meet the exhaustion requirement would now find the claims procedurally barred."

2  *Id.* at 735 n.1.  If no remedies are currently available pursuant to Rule 32, the claim is

3  "technically" exhausted but procedurally defaulted.  *Coleman*, 501 U.S. at 732, 735 n.1; *see*

4  *also Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

5  Because the doctrine of procedural default is based on comity, not jurisdiction, federal

6  courts retain the power to consider the merits of procedurally defaulted claims.  *Reed v. Ross*,

7  468 U.S. 1, 9 (1984).  As a general matter, the Court will not review the merits of a

8  procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure

9  to properly exhaust the claim in state court and prejudice from the alleged constitutional

10  violation, or shows that a fundamental miscarriage of justice would result if the claim were

11  not heard on the merits in federal court.  *Coleman*, 501 U.S. at 750.  Ordinarily, "cause" to

12  excuse a default exists if a petitioner can demonstrate that "some objective factor external

13  to the defense impeded counsel's efforts to comply with the State's procedural rule."  *Id.* at

14  753; *see also Martinez v. Ryan*, 132 S. Ct. 1309 (2012).  "Prejudice" is actual harm resulting

15  from the alleged constitutional error or violation.  *Vickers v. Stewart*, 144 F.3d 613, 617 (9th

16  Cir. 1998).

17  **II.**  **Standard for Habeas Relief**

18  The AEDPA established a "substantially higher threshold for habeas relief" with the

19  "acknowledged purpose of 'reducing delays in the execution of state and federal criminal

20  sentences.'"  *Schriro v. Landrigan*, 550 U.S. 465, 473, 475 (2007) (quoting *Woodford v.*

21  *Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential standard for

22  evaluating state-court rulings' . . . demands that state-court decisions be given the benefit of

23  the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v.*

24  *Murphy,* 521 U.S. 320, 333 n.7 (1997)).

25  Under the AEDPA, a petitioner is not entitled to habeas relief on any claim

26  "adjudicated on the merits" by the state court unless that adjudication:

27  (1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the Supreme
28  Court of the United States; or

1
2
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

3   28 U.S.C. § 2254(d).  In conducting review under § 2254(d)(1), this Court "is limited to the

4   record that was before the state court that adjudicated the claim on the merits."  *Cullen v.*

5   *Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

6   **DISCUSSION**

7   **I.     DENIAL OF JURY TRIAL**

8           Petitioner contends that he was denied his Sixth Amendment right to a jury

9   determination on the factors that rendered him eligible for capital punishment, in violation

10  of *Ring v. Arizona*.  He argues that this denial amounted to structural error and, therefore, the

11  Arizona Supreme Court's decision to review for harmless error was contrary to or an

12  unreasonable application of controlling federal law.  Petitioner further contends that, even

13  if subject to harmless error review, the Arizona Supreme Court's finding of harmlessness was

14  contrary to federal law and based on an unreasonable determination of the facts.

15          **A.     Harmless Error Standard**

16          In *Ring*, the United States Supreme Court invalidated Arizona's judge-only capital

17  sentencing scheme by holding that a jury must determine the existence of facts rendering a

18  defendant eligible for the death penalty.  536 U.S. at 609.  Subsequently, the Arizona

19  Supreme Court, in *State v. Ring*, 204 Ariz. 534, 552, 65 P.3d 915, 933 (2003) ("*Ring III*"),

20  held that the Sixth Amendment "does not require automatic reversal of a death sentence

21  imposed under [Arizona's] former sentencing statutes."  Instead, relying on *Neder v. United*

22  *States*, 527 U.S. 1, 8 (1999), and *Arizona v. Fulminante*, 499 U.S. 279, 306-07 (1991), the

23  court held that it would review capital sentences under the harmless error standard.  *Id.* at

24  552-53, 65 P.3d at 933-34.  Having rejected the argument that *Ring* error is structural, the

25  Arizona Supreme Court applied the harmless error test in evaluating Petitioner's death

26  sentence.  *Sansing II*, 206 Ariz. at 235, 77 P.3d at 33.  This was not contrary to or an

27  unreasonable application of clearly established federal law.

28          A structural error is a "defect affecting the framework within which the trial proceeds,

1  rather than simply an error in the trial process itself." *Fulminante*, 499 U.S. at 310.

2  Structural error affects "the entire conduct of the trial from beginning to end." *Id.* at 309.

3  The "very limited class of cases" in which structural error has been found feature "such

4  defects as the complete deprivation of counsel or trial before a biased judge," which

5  "necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for

6  determining guilt or innocence." *Neder*, 527 U.S. at 8 (finding that a jury instruction

7  omitting an element of the offense does not constitute structural error).

8      The United States Supreme Court has never held that *Ring* error is included in that

9  limited class of cases.  In *Ring* itself, the Court declined to "reach the State's assertion that

10  any error was harmless because a pecuniary gain finding was implicit in the jury's guilty

11  verdict." 536 U.S. at 609 n.7; *see id.* at 621 (Justice O'Connor dissenting) ("I believe many

12  of these challenges will ultimately be unsuccessful . . . because the prisoners will be unable

13  to satisfy the standards of harmless error.").  Subsequently, in *Schriro v. Summerlin*, holding

14  that *Ring* did not apply retroactively, the Court rejected claims that *Ring* was either a

15  substantive ruling or a "watershed rule[] of criminal procedure implicating the fundamental

16  fairness and accuracy of the criminal proceeding," explaining that it could not "confidently

17  say that judicial factfinding so *seriously* diminishe[s] accuracy that there is a large risk of

18  punishing conduct the law does not reach."  542 U.S. 348, 355-356 (2004) (internal

19  quotations omitted).

20      As the Arizona Supreme Court explained in *Ring III*, 204 Ariz. at 545, 554-55, 65

21  P.3d at 926, 935-36, the holding in *Ring* was preceded by, and premised on, the ruling in

22  *Apprendi v. New Jersey*, which held that "any fact that increases the penalty for a crime

23  beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond

24  a reasonable doubt." 530 U.S. 466, 490 (2000).  There is no question that *Apprendi* errors

25  are subject to harmless error analysis. *See Washington v. Recuenco*, 548 U.S. 212, 218-22

26  (2006) (holding that *Apprendi* errors are reviewed for harmlessness using the framework of

27  *Neder*); *see also United States v. Zepeda-Martinez*, 470 F.3d 909, 910 (9th Cir. 2006).

28      The Arizona Supreme Court did not unreasonably apply Supreme Court precedent

1   when it determined that harmless error was the appropriate standard of review.  *Ring* error

2   does not affect the framework within which the trial proceeds or the entire conduct of the

3   trial, but only the trial process itself.  The state court properly found that *Ring* error, like the

4   failure to instruct a jury on an element of the offense, was not so fundamental that it

5   necessarily rendered Petitioner's capital sentence unfair or unreliable.

6          **B.     Harmless Error Analysis**

7          On direct appeal, the Arizona Supreme Court rejected Petitioner's argument that it

8   could not determine beyond a reasonable doubt that no jury would find the mitigating

9   circumstances sufficient to call for leniency.  *Sansing*, 206 Ariz. at 241, 77 P.3d at 39.

10  Petitioner argues that the state court's harmless error analysis was unreasonable and contrary

11  to Supreme Court law.

12         Relevant Facts

13         Petitioner pled guilty on September 18, 1998, to all of the charged offenses.  The plea

14  agreement provided that Petitioner could be sentenced on the first-degree murder count to

15  life imprisonment for a minimum of 25 years, life imprisonment without the possibility of

16  release, or death.  (ROA doc. 61.)  In a written factual basis statement accompanying the

17  plea, Petitioner admitted that he planned to rob the victim before her arrival and that he

18  struck her in the head with a wooden stick after detaining her in his home.  (ROA doc. 60.)

19  He also admitted that the victim was conscious after he returned from moving her vehicle and

20  that he "knowingly engaged" in sexual intercourse with her without her consent while she

21  was bound and tied.  Petitioner further stated that the victim was blindfolded, gagged, and

22  had two plastic bags placed over her head, and that he stabbed her in the abdomen.

23         *Sentencing Proceedings*

24         Sentencing took place one year after entry of the guilty plea.  In its presentencing

25  memorandum, the State urged the trial court to find three aggravating factors:  the (F)(5)

26  pecuniary gain factor, the (F)(6) heinous, cruel, or depraved factor, and the (F)(2) prior

27  serious offense factor.  (ROA doc. 96 at 7-31.)  At the aggravation/mitigation hearing, the

28  State proffered testimony from Detective Joseph Petrosino, Dr. Mark Fischione, and Kara

1    Sansing, Petitioner's wife.   In addition, the parties jointly stipulated to admission of

2    audio/video taped interviews of Petitioner's four children as well as statements made by the

3    children to a counselor, Dr. Carol Ainley, in lieu of calling the children as witnesses. (Doc.

4    38-7 at 5.)  The parties also stipulated to the admission of statements made by Petitioner to

5    a reporter, Victoria Harker, as well as DNA test results from (1) a vaginal swab of the victim

6    indicating the presence of Petitioner's semen, and (2) a carpet swatch from Petitioner's home

7    indicating the presence of the victim's blood.  (*Id.* at 7-8.)

8         Det. Petrosino described the crime scene, including the numerous items that covered

9    the victim's body when it was found behind a shed in Petitioner's backyard.  (RT 8/2/99 at

10   25-29.)  He also described discovering in Petitioner's home a broken piece of a wooden club

11   in a sink cabinet and a rusty boning knife later identified by Kara Sansing as the one used by

12   Petitioner to stab Trudy Calabrese.  (*Id.* at 45-49.)  Dr. Fischione testified concerning the

13   victim's numerous injuries.  He opined that she died as a result of multiple stab wounds to

14   her abdomen and blunt force head trauma.  (RT 8/3/99 at 55.)  He further testified that it was

15   possible Calabrese regained consciousness after receiving the head injuries but he "doubt[ed]

16   it."  (*Id.* at 34.)

17        Kara Sansing, who pled guilty to first-degree murder in exchange for a life sentence

18   with the possibility of release after 25 years, testified to the events surrounding Calabrese's

19   death.  On the day of the murder, Petitioner called her at work several times and at one point

20   said he had obtained and smoked some crack cocaine.  (RT 8/2/99 at 55.)  After returning

21   home from work, Kara smoked crack and waited with her husband for Calabrese to arrive

22   less than an hour later.  She testified that her children could see her and Petitioner tie up the

23   victim, who kicked and struggled against the bindings and pleaded not to be hurt.  (*Id.* at 64-

24   69.)   Calabrese also repeatedly asked the Sansing children to call 911 and became

25   unconscious when Petitioner struck her in the head with a wooden club.  Petitioner then

26   moved Calabrese's truck and upon returning dragged her to a bedroom and raped her.  Kara

27   also testified that she heard Calabrese speak with Petitioner during the sexual assault.  (*Id.*

28   at 78-79.)  Afterward, Petitioner stabbed Calabrese with a knife and then used her jewelry

1    to twice buy crack from dealers who came to the house in the hours following the murder.

2    Kara also testified that she had been married to Petitioner for 14 years and that he was not

3    acting normal that day compared to previous times he took drugs.  (RT 8/3/99 at 6-7.)

4         Each of Petitioner's children reported to investigators that their father grabbed the

5    victim from behind and held her down while their mother helped tie her up.  (Doc. 38-5 at

6    6, 17-19; Doc. 38-6 at 9-10, 21.)  In her report, Dr. Ainley stated that Petitioner's 12-year-old

7    son saw his father hit Calabrese with a wooden pole and that his parents would not let him

8    help her.  (Doc. 38-7 at 5-6.)  Dr. Ainley further stated that this son suffers from severe guilt

9    at having followed his father's direction to find an extension cord to bind the victim.  (*Id.* at

10   7.)  Petitioner's ten-year-old son described seeing his father break a stick on Calabrese's head

11   and wash one of the pieces before stashing it under the sink.  (Doc. 38-6 at 6-7, 11.)  The

12   children further told investigators that the victim prayed to God for help and asked them to

13   call 911.  Dr. Ainley also relayed that each of the children reported seeing the victim in the

14   bedroom under a pile of clothes and again the next day behind the shed.  (Doc. 38-7 at 7.)

15   In addition, two of the children told Dr. Ainley that their parents regularly used drugs.  (*Id.*)

16        The parties stipulated that Victoria Harker, a reporter for the Arizona Republic, would

17   testify that Petitioner told her in January 1999 that he had not planned to rob or harm the

18   victim prior to her arrival at his house but decided to end her suffering after raping and

19   beating her so badly.  (Doc. 38-7 at 8.)  Petitioner also denied to Harker that his children

20   witnessed the attack but conceded that they may have seen Calabrese tied up and that she had

21   regained consciousness after he moved her truck.  (*Id.*)  Petitioner told Harker that once he

22   attacked the victim he "had to finish it up because I was going to jail anyway. . . . Once you

23   start something, you just can't stop."  (*Id.* at 9.)

24        During the mitigation portion of the presentencing hearing, Petitioner proffered

25   statements and testimony from four witnesses:  his wife Kara, his sister Patsy Hooper, his

26   mother Glenda Singh, and his brother Allan Sansing.  Petitioner also made a statement, and

27   the parties stipulated that Petitioner was arrested peaceably at his sister's house after their

28   father called the police.  (ROA doc. 90.)

1    Kara Sansing pleaded with the court to spare her husband's life. (RT 8/31/99 at 4.)
2    She reiterated her previous testimony that Petitioner was not acting normal, even under the
3    influence of drugs, on the day of the murder. (*Id.* at 8.)  Patsy Hooper testified about the
4    close bond she shared with Petitioner, whom she said was the baby of the family and loved
5    by all. (*Id.* at 9.)  She described the struggles he and his wife endured trying to raise four
6    children and how Petitioner visited her to confess the crime and wait to be arrested after she
7    asked their father to call the police. (*Id.* at 10-11.)  She begged the court to spare his life,
8    noting that her brother was willing to take responsibility for what he had done while on drugs
9    and that his children would suffer if he was sentenced to death. (*Id.* at 11-12.)

10    Petitioner's mother stated that she had been a single mother, who worked hard as a
11    waitress to make enough money to feed and house her family. (*Id.* at 20.)  She said her son
12    and his wife had been going to church and were doing well until drugs took over Petitioner's
13    life. (*Id.*)  She acknowledged the wrongfulness of Petitioner's conduct, but asked that his life
14    be spared for the sake of his children. (*Id.* at 20-21.)  Petitioner's brother told the court that
15    despite not being a close family, he loved his brother and hoped his life would be spared. (*Id.*
16    at 22.)  He said that Petitioner was not a monster, that drugs led Petitioner to commit such
17    a horrific crime, and that life imprisonment would be sufficient punishment because
18    Petitioner was tormented daily by the knowledge of what he did to the victim and her family.
19    (*Id.* at 22-23.)  He further said that he lived in the same room with Petitioner from age five
20    to 15 and that Petitioner did not have a violent side despite their hard life. (*Id.*)

21    Petitioner concluded the presentence hearing with a lengthy statement. He began with
22    an apology to the victim's family for his "really terrible" and "awful" acts. (*Id.* at 24-25.)
23    "[A]s I have said many times before to the media and also to the Court, that what I have done
24    deserves the death penalty but I ask for mercy from the Court to spare my life and give me
25    a chance to prove myself as a human being, not as a monster that people make me out to be."
26    (*Id.* at 25.)  Petitioner acknowledged essentially asking for the death penalty at one point in
27    the process but realized after speaking with a jail psychiatrist that it would be better for his
28    wife and children if his life was spared. (*Id.* at 26.)  Next, Petitioner addressed the victim's

1   husband directly and again apologized for the nightmare he created.  (*Id.* at 27.)  Petitioner
2   said he had been praying for the Calabrese family and that he pled guilty to spare them
3   additional pain.  (*Id.* at 27-28.)  Petitioner then addressed his own family, saying he did not
4   "blame no one or nothing in my past to lead to what I had done."  (*Id.* at 29.)  He remarked
5   that everyone knew he had problems with drugs and wished the family "could have taken
6   some actions to get me the help I needed."  (*Id.*)  However, he also acknowledged he "would
7   have refused it because drugs meant the world" to him.  (*Id.*)  Petitioner apologized for the
8   pain he caused his family, emphasized his love for them, and asked them to go along with
9   his desire to donate his organs should he be sentenced to death.  (*Id.* at 30-31.)  Finally,
10  Petitioner addressed his wife, stating that he probably would have hurt her had she not gone
11  along with his attack on the victim, that he was to blame for letting drugs take over his life,
12  and that he loved her deeply.  (*Id.* at 32-33.)  In conclusion, Petitioner told the judge he was
13  a new person now that he was off of drugs and asked that his life be spared for the sake of
14  his loved ones.  (*Id.* at 34-35.)

15      Prior to sentencing, a mitigation specialist employed by the defense provided a
16  notebook of materials to the judge.  These included a letter reporting Petitioner's social
17  history, numerous photographs, school records, and articles about crack cocaine and
18  marijuana.  (Doc. 44-3.)  The report provided details of Petitioner's genetic background,
19  developmental years, and criminal background.  It stated that between the ages of six and ten,
20  Petitioner was exposed to weekly domestic abuse, fueled by his mother's and stepfather's
21  alcohol abuse.  It further stated that at age 14 Petitioner was sent to a juvenile corrections
22  facility for breaking into a school while on probation and that testing there found him to be
23  functioning in the borderline IQ range.  Available school records indicated that Petitioner
24  failed classes and quit school shortly after ninth grade.  The report described Petitioner's
25  abusive relationship with his wife and their drug addiction, asserting that they attempted to
26  quit and sought help from family members and their church but relapsed shortly before the
27  offense.  According to the mitigation specialist, at the time of the murder, Petitioner and his
28  wife had been on a four-day crack cocaine binge.  In conclusion, the report asked the court

to sentence Petitioner to life without the possibility of parole based on his genetics, childhood environment, cooperation with authorities, genuine remorse, and the influence of drugs during the offense.

In a presentencing memorandum, defense counsel refuted application of the State's alleged aggravating factors and urged the trial court to find that the proffered mitigation outweighed any aggravation. (ROA doc. 97.)  With regard to statutory mitigating factors, counsel argued that Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired by the abuse of alcohol and crack cocaine. *See* A.R.S. § 13-703(G)(1). Counsel also argued that Petitioner's 31 years of age was a mitigating factor under § 13-703(G)(5) because he lacked intelligence, as indicated by his poor academic history and the "lack of planning" and "unsophisticated approach" to the crime.  (ROA doc. 97 at 15.)  In the event the court did not find the existence of significant impairment and age under (G)(1) and (G)(5), counsel asked the court to nonetheless find them to be non-statutory mitigating factors.

Defense counsel also urged numerous other non-statutory mitigating factors, asserting that Petitioner had a difficult childhood, grew up in a dysfunctional family, and witnessed significant abuse during his formative years.  (ROA doc. 97 at 15.)  Counsel noted Petitioner's low intelligence and lack of education.  (*Id.* at 16.)  Counsel argued that Petitioner did not have a violent character or history and would not likely be a future danger, especially in the controlled setting of a prison; that Petitioner's pleading guilty and accepting responsibility demonstrated that he had potential for rehabilitation; and that as a result of Petitioner's reflection on his actions he was committed to changing his behavior for the better. (*Id.* at 16-17.)  Counsel emphasized that Petitioner's family loved and supported him, despite what he had done, and that Petitioner's children in particular would be devastated if he were sentenced to death.  (*Id.* at 17-18.)  Counsel also noted that the victim's husband had not requested the death penalty and that her ten-year-old daughter expressly asked that Petitioner not be sentenced to death.  (*Id.* at 18.)

Finally, counsel addressed Petitioner's remorse, observing that Petitioner "has

accepted full responsibility for his conduct and expressed deep and genuine remorse for his

actions almost from the beginning of this litigation." (*Id.* at 18.) Counsel continued:

> This was never a part of any strategy to seek leniency from this Court. As counsel told the Court at the time of the change of plea in September of 1998, John Sansing told his lawyers at their second visit, just a few days after his arrest, that "There isn't going to be a trial . . . I am responsible for what I have done . . . I'm not going to put the victim's family or my children through a trial."
>
> From that day forward, John Sansing expressed a desire to public [sic] apologize to the victim's family and plead guilty to what he had done. It was counsel undersigned who delayed the process until September of 1998, so that they could investigate the case and properly advise the defendant of his options. John Sansing on numerous occasions expressed his frustration with his counsel about the delay in going to court and pleading guilty.
>
> Counsel undersigned has had numerous conversations with John Sansing since February of 1998. We believe that his remorse and acceptance of responsibility are complete and absolutely genuine. He has spoken with deep regret about the pain and suffering that he has caused the Calabrese family and the trauma that he has caused to his own children.

(*Id.* at 18-19.) In support, counsel appended to their memorandum the transcript from a

November 1998 sentencing status conference during which Petitioner apologized for his

actions, explained why he pled guilty, minimized his wife's involvement, and stated that he

was willing to accept the death penalty. (RT 11/24/98 at 3-7.) Counsel concluded by noting

that Petitioner's level of remorse and acceptance of responsibility were, in their experience,

unique for this type of case and asked that these factors be given substantial mitigating

weight. (*Id.* at 19-20.)

   Prior to sentencing Petitioner sent two letters to the trial judge. In the first, Petitioner

requested an opportunity to speak with his wife about their children and to physically say

goodbye to her and other family members. He also noted his willingness to accept the death

penalty if the court believed that to be the appropriate punishment. In the second, Petitioner

requested that his sentencing be postponed a few days while he figured out how to donate his

organs.

   A presentence report (PSR) was also prepared by the court's probation department.

(ROA doc. 101.) On the advice of counsel, Petitioner declined to discuss his background,

substance abuse issues, or the offense, and the PSR writer noted that defense counsel would

1    be providing that information directly to the court.  The PSR did include a statement from
2    Petitioner's sister, Patsy Hooper, who opined that drugs influenced Petitioner's actions and
3    that he was remorseful.  In addition, the victim's husband stated that he would agree with any
4    sentence the judge chose to hand down.

5         Sentencing took place on September 30, 1999.  Prior to imposition of sentence,
6    Petitioner made another statement, again apologizing, expressing remorse, and asking that
7    his organs be donated if sentenced to death.  (RT 9/30/99 at 3-5.)  The court indicated that
8    it had considered the evidence presented at the aggravation/mitigation hearing, the parties'
9    written memoranda, and the written mitigation materials proffered by the defense.  (*Id.* at 6-
10   7.)  The court also indicated that it had not considered any information contained in the PSR
11   or any victim impact statements in determining the existence or nonexistence of aggravating
12   factors, but did consider the PSR to determine the existence of mitigating circumstances.  (*Id.*
13   at 7.)

14        Regarding aggravation, the trial court rejected the State's argument that Petitioner's
15   contemporaneous convictions for kidnapping, sexual assault, and robbery of the victim
16   constituted a prior "serious offense" for purposes of A.R.S. § 13-703(F)(2).  However, the
17   court agreed with the State that the evidence established beyond a reasonable doubt that
18   Petitioner committed the offense for pecuniary gain under § 13-703(F)(5) and that the murder
19   was committed in an "especially heinous, cruel, or depraved" manner under § 13-703(F)(6).
20   For the latter, the court found both (F)(6) prongs—that the killing was cruel as well as
21   heinous and depraved.

22        In finding that the murder was especially cruel, the court first determined that the
23   victim "suffered unimaginable mental anguish during the approximately one hour or more
24   that she was held hostage prior to her death."  (RT 9/30/99 at 11.)  Citing the testimony of
25   Kara Sansing, as well as the Sansing children's statements to the police and Dr. Ainley, the
26   court found that the victim had prayed to God and pleaded with them to call 911.  (*Id.* at 11-
27   12.)  The court further noted that both Petitioner, in an interview with a newspaper reporter,
28   and his wife stated that the victim had regained consciousness before Petitioner raped her.

1   This also established "beyond a reasonable doubt that Trudy Calabrese suffered

2   extraordinary mental anguish, including uncertainty as to her ultimate fate." (*Id.* at 13.)

3        Second, the court found cruelty based on its determination that the victim consciously

4   suffered severe physical pain prior to her death and that the defendant knew or should have

5   known she would suffer.  In support, the court referenced ligature wounds and bruises on the

6   victim's wrists and ankles, defensive wounds to her hands, trauma to her face, and "two deep

7   blows to the back her head, which caused bruising of the brain and hemorrhaging." (*Id.*)

8   Although the court agreed the victim likely passed out from the head blows, it found that she

9   regained consciousness before the rape and was then stabbed three times in the abdomen with

10  a rusty knife. (*Id.*)  Citing the medical examiner's testimony, the court found that it would

11  have taken several minutes to die from the loss of blood caused by the stab wounds. (*Id.* at

12  14.)  Finally, the court referenced Petitioner's own statement to a reporter that he killed the

13  victim to end her suffering as proof she was consciously suffering severe physical pain. (*Id.*)

14        In finding that the murder was committed in an especially heinous or depraved

15  manner, the court determined that Petitioner inflicted gratuitous violence, that the victim was

16  helpless, and that the killing was senseless. *See State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1

17  (1983) (identifying factors to be considered in determining whether a killing is heinous or

18  depraved).  In finding gratuitous violence, the court stated that Petitioner hit the victim "so

19  hard with the club that it broke in two pieces.  He hogtied her ankles and wrists and brutally

20  sexually assaulted her.  Finally, he stabbed her, not once but three times, even grinding the

21  rusty butcher knife into her as witnessed by Kara Sansing." (RT 9/30/99 at 15.)  As to the

22  other factors, the court stated that the victim "was rendered utterly and completely helpless

23  by the defendant's surprise attack" and that the killing was senseless because it "was

24  completely unnecessary in order for the defendant to accomplish his goal of robbing Trudy."

25  (*Id.* at 16.)

26        Turning to mitigation, the court found it likely that Petitioner was impaired or affected

27  by his crack cocaine usage at the time of the murder.  However, it did not find that this

28  established by a preponderance of the evidence that Petitioner's capacity to appreciate the

1    wrongfulness of his conduct or to conform his conduct to the requirements of the law was

2    *significantly* impaired, pursuant to A.R.S. § 13-703(G)(1). (RT 9/30/99 at 17-18.) In making

3    this determination, the court noted that Petitioner "devised and carried out a plan to lure a

4    Good Samaritan to his home and then rob her," consciously sought to hide her truck, and

5    concealed her body to avoid detection. (*Id.* at 18.) The court also rejected the (G)(5) age

6    factor, finding that Petitioner was a 31-year-old married father of four who had been living

7    an adult lifestyle for many years. (*Id.* at 19.)

8          With regard to non-statutory mitigating factors, the court again declined to find that

9    Petitioner had established age as a mitigator and ruled that the victim's daughter's

10   recommendation of leniency was not a mitigating circumstance. (*Id.* at 20, 23.) The court

11   also found that Petitioner had failed to prove by a preponderance of the evidence that he had

12   changed his life, would not be a future danger, or had potential for rehabilitation. (*Id.* at 22.)

13         In support of mitigation, the court determined that although Petitioner did not establish

14   significant impairment under (G)(1), Petitioner's capacity to conform his conduct to the law's

15   requirements was somewhat impaired by his use of crack cocaine. The court also found that

16   Petitioner had proven by a preponderance of the evidence that he had a difficult childhood

17   and family background. In support, the court noted that Petitioner's parents were divorced

18   shortly after his birth, he had virtually no relationship with his father, his early developmental

19   years were chaotic, his mother married three more times, and when he was six to ten years

20   of age, his mother and stepfather abused alcohol and he was exposed to weekly episodes of

21   domestic abuse by his stepfather upon his mother. (*Id.* at 20-21.) Although the court found

22   the existence of a difficult childhood as a mitigating factor, it determined this circumstance

23   was not entitled to significant mitigating weight due to the lack of a causal link between

24   Petitioner's background and the crime. (*Id.* at 21.)

25         The court further found as mitigating that Petitioner had accepted responsibility for

26   his actions, was genuinely remorseful, and entered a guilty plea to avoid putting the victim's

27   family and his children through a trial. (*Id.*) In addition, the court found that Petitioner

28   presented sufficient evidence to establish a lack of education, but determined this had only

minimal mitigating weight.  (*Id.* at 22.)  Finally, the court found that Petitioner established by a preponderance of the evidence that he had the love and support of his family but assigned it only minimal weight because it did not prevent Petitioner from committing the crime or victimizing his own children.  (*Id.*)

In determining that the proven mitigation did not outweigh the aggravation, the court considered the mitigating circumstances both individually and cumulatively.  (*Id.* at 23.)  It further found that even considering all of the proposed mitigating factors, they would be insufficient to call for leniency "when balanced against the especially cruel manner in which defendant murdered Trudy Calabrese."  (*Id.* at 24.)  The court explained:

> The infliction of such grotesque, emotional and physical pain to a woman who, with all the hate, violence and lack of compassion we see, stood out like a shining light, as a true Samaritan, is shockingly evil.  Throughout her ordeal, enveloped in defendant's drugged out and twisted plan of greed and violence, Trudy Calabrese kept her faith in God to the end.
>
> The surprise attack on this good woman, followed by being beaten with a club defendant eventually broke in two on her head, then brutally stripped of her dignity as she was raped, and finally being stabbed three times, all together resulted in a terror-filled and horrible murder.

(*Id.*)

On appeal, the Arizona Supreme Court found insufficient evidence to establish that the murder was committed "to facilitate the taking of or ability to retain items of pecuniary value."  *Sansing I*, 200 Ariz. at 354, 26 P.3d at 1125.  However, on independent review after striking the pecuniary gain aggravating factor, it found that the murder was especially cruel and that the mitigation was insufficient to call for leniency.

*Harmless Error Review*

In conducting its harmless error review following *Ring*, the Arizona Supreme Court considered the (F)(6) aggravating factor found at sentencing and upheld on appeal—that the murder was committed in an especially heinous, cruel, or depraved manner.  The court explained that the State needed to prove only one of the (F)(6) elements.  *Sansing II*, 206 Ariz. at 235, 77 P.3d at 33.

The court first determined that cruelty was established in three independent ways: (1)

the victim suffered mental anguish, as evidenced by the victim's defensive wounds, pleas for help, and attempts to resist the attack; (2) the victim suffered both mental and physical suffering when she was raped while her arms and legs were bound; and (3) the victim endured physical pain, as demonstrated by the multiple injuries to her head and abdomen, none of which caused immediate death. *Id.* at 235-36, 77 P.3d at 33-34. The court rejected Petitioner's argument that the evidence was inconclusive as to whether the victim was conscious during all portions of the attack, citing Petitioner's own admissions, including to a reporter, as well as his wife's testimony. *Id.* at 237, 77 P.3d at 35. The court concluded beyond a reasonable doubt that any reasonable jury would have found that the murder was committed in an especially cruel manner, and it was thus harmless error for the trial court to have determined the existence of this aggravating factor.

The court then determined that heinousness and depravity were established by "[o]verwhelming and uncontroverted evidence" that Petitioner inflicted gratuitous violence upon a helpless victim. *Id.* It concluded that the "rape, facial wounds, neck ligatures, gagging, blind-folding, and grinding of the knife constitute[d] violence beyond that necessary to kill," and that the victim, having been bound by both her wrists and ankles, which were then tied together, was helpless to defend herself. *Id.* at 238, 77 P.3d at 36. The court found beyond a reasonable doubt that any reasonable jury would have concluded that Petitioner inflicted gratuitous violence upon a helpless victim and that consequently the murder was especially heinous. *Id.*

Next, the court considered whether the mitigating evidence was sufficiently substantial to call for leniency. The court first assessed the evidence concerning A.R.S. § 13-703(G)(1), which provides a mitigating circumstance where "[t]he defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution." *Id.* at 239, 77 P.3d at 37. Like the trial court, the supreme court found that this factor had not been proved:

No reasonable jury would have concluded that Sansing met his burden

1

2    to establish that his ability to control his behavior or his capacity to appreciate
     the wrongfulness of his conduct was significantly impaired. Sansing presented
3    no expert testimony to support his assertion that his use of cocaine impaired
     either his capacity to control his conduct or his capacity to appreciate the
4    wrongfulness of his actions. He therefore failed entirely to show any causal
     nexus between his alleged drug use and impairment.

5           Sansing also presented only minimal testimony about his drug use on
     the day of the murder. Kara testified that Sansing telephoned her while she
6    was work at approximately 1:30 p.m. During this conversation, Sansing
     informed her that he had purchased some crack cocaine. He told her that he
7    had smoked some of the crack but was saving the rest for her. Kara testified
     that she could tell he had ingested the crack from the sound of his voice. She
8    testified that when she returned home from work several hours later, Sansing
     was not "acting normal." However, she also testified that Sansing's actions
9    were thought out and that he was not acting as if he were in a trance.

10          That evidence is insufficient to establish, by a preponderance of the
     evidence, that Sansing's capacity to control his behavior was significantly
11   impaired. First, Kara did not quantify how much crack Sansing used.
     Moreover, no reasonable jury would conclude that Kara's testimony that Sansing
12   was not acting himself was sufficient to establish that his capacity was
     significantly impaired.

13          Furthermore, Sansing's deliberate actions refute his impairment claim
     and establish that the drug use did not overwhelm Sansing's ability to control
14   his conduct. Kara testified that Sansing planned to rob the person who
     delivered the food. Additionally, Sansing contacted two different churches in
15   his attempt to lure an unsuspecting victim to his home.

16          Sansing's impairment argument fails on yet another basis. Sansing
     admitted and stipulated to facts that leave no doubt that he attempted to avoid
17   detection. After beating and hog-tying Trudy, Sansing left and moved her
     truck away from the apartment. When Pastor Becker called the Sansing home,
18   inquiring about Trudy's whereabouts, Sansing gave him a false address and
     told him that Trudy never arrived. Additionally, Sansing's ten-year-old son
19   told the police Sansing washed blood from the club that he used to strike
     Trudy. These steps, which can only be regarded as part of an attempt to avoid
20   detection, negate any possibility that a reasonable jury would find that
     Sansing's capacity to appreciate the wrongfulness of his conduct was
21   significantly impaired.

22   *Id.* at 239-40, 77 P.3d at 37-38 (citations omitted). The court further found beyond a

23   reasonable doubt that any reasonable jury would have rejected Petitioner's age as a statutory

24   mitigating circumstance.

25          The court then proceeded to examine the non-statutory mitigating circumstances

26   found by the trial court. For the same reasons the court determined that the (G)(1)

27   impairment factor would not have been found, the court reasoned that no reasonable jury

28   could have accorded Petitioner's impairment more than minimal weight as a non-statutory

mitigating factor. *Id.* at 240-41, 77 P.3d at 38-39. The court further concluded that although a jury "might have concluded that Sansing established a difficult, although not abusive, childhood and lack of education," it would have accorded these factors only minimal weight because Petitioner had failed to demonstrate any causal link between them and the crime. *Id.* at 241, 77 P.3d at 39. Next, the court assumed that "a reasonable jury would have accorded some weight to Sansing's family's love and support and to the fact that he accepted responsibility for his crime." *Id.* Lastly, the court determined that no reasonable jury could have given more than minimal weight to Petitioner's claim that he presents no future threat and that a jury could not have considered the victim's daughter's request that he be given a life sentence because such evidence is not proper mitigation. *Id.*

The Arizona Supreme Court concluded its harmless error review as follows:

> The evidence leaves no doubt that Sansing murdered Trudy Calabrese in an especially cruel, heinous, or depraved manner. The brutality of this murder clearly sets it apart from the norm of first degree murders. Collectively, the mitigating evidence is minimal at most. We conclude beyond a reasonable doubt that any reasonable jury would have concluded that the mitigating evidence was not sufficiently substantial to call for leniency. Accordingly, we hold the [*Ring*] violation constituted harmless error.

*Id.*

<u>Analysis</u>

Petitioner is entitled to relief on this aspect of Claim 1 only if the Arizona Supreme Court's ruling was "in conflict with the reasoning or the holdings of [Supreme Court] precedent" or if it "applied harmless-error review in an 'objectively unreasonable' manner." *Mitchell v. Esparza*, 540 U.S. 12, 17, 18 (2003) (per curiam) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75-77 (2003)); *see also Fry v. Pliler*, 551 U.S. 112, 119 (2007) ("In *Mitchell v. Esparza*, we held that, when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."). He is not entitled to relief if the state court "simply erred" in concluding that the *Ring* error was harmless. *Esparza*, 540 U.S. at 18.

Petitioner first argues that the Arizona Supreme Court's determination that the victim was conscious, upon which he asserts its finding of cruelty rests, was based upon an

1    unreasonable determination of the facts. (Doc. 35 at 42-44.) He contends that the evidence

2    was inconclusive in light of the medical examiner's doubt about the victim regaining

3    consciousness after the head injuries, the alleged unreliability of Kara Sansing's statements,

4    and questions concerning the voluntariness of the written factual basis supporting Petitioner's

5    plea. (*Id.*) However, the latter two allegations are based on evidence that was not part of the

6    record on appeal to the Arizona Supreme Court. Under AEDPA, this Court must consider

7    whether the state court's decision "was based on an unreasonable determination of facts *in*

8    *light of the evidence presented in the State court proceeding*." 28 U.S.C. § 2254(d)(2)

9    (emphasis added); *see also Pinholster*, 131 S. Ct. at 1398-99 (limiting review under §

10   2254(d)(1) "to the record that was before the state court that adjudicated the claim on the

11   merits").

12        Petitioner alleges that Kara Sansing's statement to police regarding an exchange

13   between Petitioner and the victim during the rape is "completely unbelievable." (Doc. 35 at

14   43.) He acknowledges, however, that evidence of the actual exchange was not admitted

15   during the sentencing proceeding. During her testimony, Kara initially denied hearing the

16   victim speak and was then impeached with her statement to police concerning the fact the

17   victim had spoken. However, in doing so, the prosecutor directed her not to repeat the

18   content of the conversation she overheard. (RT 8/2/99 at 78.) That this evidence was not

19   before the state court is confirmed by Petitioner's motion for evidentiary development, in

20   which he seeks to expand the record to include Kara Sansing's statement to police, arguing

21   it is relevant to demonstrate the unreliability of her testimony regarding consciousness. (Doc.

22   53 at 21.) Similarly, Petitioner's allegation concerning involuntariness of the factual basis

23   of his plea was not developed until his state PCR proceedings and thus was not before the

24   Arizona Supreme Court when it conducted its harmless error review. Accordingly, the Court

25   does not consider either of these allegations in determining under AEDPA the reasonableness

26   of the state court's ruling.

27        Looking at the record that was before the state court, this Court cannot say that its

28   finding of fact as to consciousness was objectively unreasonable. Petitioner admitted in the

1  factual basis for the plea that the victim was conscious when he raped her and also stipulated

2  that he told a reporter the victim had regained consciousness when he returned from moving

3  her truck.  Petitioner's wife also testified that she heard the victim speak during the rape, and

4  Petitioner told the reporter that he decided to kill the victim because she was suffering.  The

5  Arizona Supreme Court considered the medical examiner's speculation about the victim's

6  consciousness but found the direct evidence uncontroverted.  This was not an unreasonable

7  determination of fact.

8       Moreover, Arizona law provides that a victim need not be conscious for "each and

9  every wound" inflicted for cruelty to apply.  *Sansing*, 206 Ariz. at 235, 77 P.3d at 33 (citation

10 omitted).  There is no dispute that Trudy Calabrese was conscious when she was grabbed

11 from behind, thrown to the ground, and hogtied.  She sustained numerous defensive wounds

12 and other injuries during her struggle, pleaded for help, and prayed to God.  The Arizona

13 Supreme Court's finding of cruelty based on the victim's mental anguish as to her fate while

14 she struggled with her attackers was not objectively unreasonable.  This alone was sufficient

15 under state law to sustain the cruelty factor, regardless of whether the victim was conscious

16 during the rape and stabbing.

17      Petitioner further contends that the court's cruelty analysis is unreasonable when

18 compared with its decisions in other *Ring*-remand cases.  However, to the extent that his

19 argument is based on a comparison with the analyses undertaken in other cases, Petitioner's

20 critique of the Arizona Supreme Court's cruelty finding in his case is unavailing.  The fact

21 that the court did not find cruelty beyond a reasonable doubt in other cases, each of which

22 involved distinct facts and circumstances, does not demonstrate that the same court's ruling

23 in Petitioner's case was objectively unreasonable.

24      Petitioner next argues that the Arizona Supreme Court unreasonably found that the

25 murder was especially heinous.  He asserts that the evidence was insufficient to establish

26 beyond a reasonable doubt that Petitioner inflicted gratuitous violence because "it was

27 impossible to determine which of the three stab wounds were fatal."  (Doc. 35 at 47.)

28 However, the state court's determination was not based solely on the stab wounds.  Rather,

1   it cited the numerous injuries sustained by the victim, including to her forehead, left orbital

2   region, and mouth, as well as the rape, neck ligatures, gagging, blindfolding, and grinding

3   of the knife as constituting violence beyond that necessary to kill.  *Sansing*, 206 Ariz. at 238,

4   77 P.3d at 36.   The state court's finding as to gratuitous violence was not based on an

5   unreasonable determination of the facts in light of the evidence.

6           Lastly, Petitioner criticizes the court's assessment of the mitigating evidence.  This

7   criticism is unwarranted.  The Supreme Court in *Ring* held only that a jury must determine

8   the aggravating factors in a capital case that render a person eligible for the death penalty;

9   it did not require jury determination of the ultimate sentence.   Therefore, the Arizona

10  Supreme Court's review of *Ring* error was complete when it determined beyond a reasonable

11  doubt that no rational jury would have found that the (F)(6) aggravating factor had not been

12  proved.  *Cf. Butler v. Curry*, 528 F.3d 624, 648-49 (9th Cir. 2008) (reviewing *Apprendi*

13  violation for harmless error by asking whether jury would have found aggravating factor

14  rendering defendant eligible for increased sentence).  To the extent the Arizona Supreme

15  Court chose to include review of mitigation as part of its harmless error analysis, it did so as

16  a matter of state law.  Furthermore, the court's review of the mitigating evidence, while not

17  required by *Ring*, was thorough, and its assessment of the evidence was not objectively

18  unreasonable.  Petitioner's argument that the court improperly imposed a causal nexus on its

19  consideration of the mitigating evidence is discussed as part of Claim 7 in Section IV.A

20  below.

21          **C.    Conclusion**

22          The Arizona Supreme Court did not unreasonably apply United States Supreme Court

23  precedent when it determined that harmless error was the appropriate standard of review for

24  *Ring* error.  In addition, the state court's harmless error analysis in this case neither conflicted

25  with controlling Supreme Court law nor was applied in an objectively unreasonable manner.

26  Because Petitioner is precluded from relief by § 2254(d), the Court declines to expand the

27  record to include new evidence allegedly refuting the state court's finding as to the

28  consciousness of the victim when she was sexually assaulted and stabbed.

1  **II.      VOLUNTARINESS OF PLEA**

2          In Claim 8, Petitioner argues that his guilty plea was not knowing, intelligent, or

3  voluntary because the written factual basis established an aggravating factor and he did not

4  waive his privilege against self-incrimination for the penalty phase.  He asserts that he was

5  unaware his admission concerning the victim's consciousness would be used to establish

6  cruelty under A.R.S. § 13-703(F)(6) and that the trial court failed to explain the

7  consequences this admission would have at sentencing.

8          <u>Relevant Facts</u>

9          Petitioner's written plea agreement included a summary of the rights waived by

10  pleading guilty, including the privilege against self-incrimination.  (ROA doc. 61.)  The

11  signed plea agreement did not give Petitioner any benefits in terms of sentencing, but did

12  provide that the State would dismiss charges filed against Petitioner in a separate action.[4]

13  (*Id.*)  Before accepting Petitioner's plea, the court first determined that Petitioner was

14  mentally competent.  (RT 9/18/08 at 2-3).  The court then engaged Petitioner in a personal

15  colloquy that included ascertaining whether Petitioner had read and understood the plea

16  agreement, including the paragraph setting forth the constitutional rights he was giving up

17  by pleading guilty.  (*Id.* at 6-7.)

18          After Petitioner entered his guilty plea, the court read the factual basis signed by

19  Petitioner and counsel, asking if the facts were true and if the statement accurately recounted

20  the offense; Petitioner replied affirmatively to both inquiries.  (*Id.* at 8-11.)  The prosecutor

21  then sought to orally add several additional facts, including that the victim suffered severe

22  blows to the head, that semen found inside the victim was determined to contain DNA

23  matching Petitioner, and that a different charitable organization had delivered a food box to

24  Petitioner's home the day before the offense.  (*Id.* at 11.)  Petitioner disputed only the latter

25  assertion that he had received an earlier food box.  (*Id.* at 11-12.)

26

27  ──────────────

28          [4]  Although not apparent on the face of the agreement, Respondents assert that this
separate matter involved four counts of child abuse.

1    In his PCR petition, Petitioner argued that he would not have pled guilty had he
2    understood the sentencing consequences of the factual admissions accompanying the plea.
3    (Doc. 38-10 at 24-27.)  In support, he appended an affidavit attesting that at the time of the
4    plea he was unaware that (1) the State would have to prove aggravating factors to render him
5    eligible for the death penalty; (2) the victim's consciousness would be relevant to a finding
6    of cruelty; and (3) the admission regarding consciousness was not a necessary component
7    of the guilty plea.  (Doc. 39-7 at 14-15.)  Petitioner also denied that the victim was in fact
8    conscious after he moved her truck and claimed that he lied about this fact because he feared
9    being attacked by other inmates for having sexually assaulted the victim and thought "it
10   would be better if she was conscious during my assault."  (*Id.* at 15-16.)

11   The state PCR court denied relief without explanation, stating that the claim failed to
12   present "a material issue of fact or law."  (Doc. 38-9 at 29.)  The Arizona Supreme Court
13   summarily denied review.

14   <u>Analysis</u>

15   When a state court does not explain its reasons for denying relief, a reviewing habeas
16   court must determine what arguments or theories could have supported the state court's
17   decision and "then it must ask whether it is possible fairminded jurists could disagree that
18   those arguments or theories are inconsistent with the holding in a prior decision" of the
19   Supreme Court.  *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011).  The burden is on
20   Petitioner to show "there was no reasonable basis for the state court to deny relief." *Id.* at
21   784.

22   Due process requires that a defendant's guilty plea be voluntary and intelligent.
23   *Boykin v. Alabama*, 395 U.S. 238, 242 (1969).  Because a guilty plea waives the rights
24   against self-incrimination, to trial by jury, and to confront one's accusers, its acceptance
25   requires that the accused "has a full understanding of what the plea connotes and of its
26   consequence."  *Id.* at 244.  "Among other circumstances, a plea of guilty can be voluntary
27   only if it is 'entered by one fully aware of the *direct* consequences' of his plea."  *Carter v.*
28   *McCarthy*, 806 F.2d 1373, 1375 (9th Cir. 1986) (quoting *Brady v. United States*, 397 U.S.

742, 755 (1970)) (emphasis in original).  This includes being advised of the "range of allowable punishment" that will result from the plea.  *U.S. ex rel. Pebworth v. Conte*, 489 F.2d 266, 268 (9th Cir. 1974).

The Ninth Circuit has held that "although a defendant is entitled to be informed of the direct consequences of the plea, the court need not advise him of all the possible collateral consequences."  *Torrey v. Estelle*, 842 F.2d 234, 235 (9th Cir. 1988) (internal quotation omitted).  "The distinction between a direct and collateral consequence of a plea turns on whether the result represents a definite, immediate and largely automatic effect on the range of the defendant's punishment."  *Id.* at 236 (internal quotation omitted).  Under this standard, direct consequences include a mandatory parole term, ineligibility for parole, and the maximum punishment provided by law.  *Id.*  A consequence is generally "collateral" if it does not derive automatically as a result of the plea, but rather results from some discretionary decisionmaking proceeding, such as whether a defendant's sentences may run consecutively or the possibility of parole revocation.  *Id.*

Petitioner argues that the failure to inform him of the sentencing-related consequences attendant to his admission in the plea's factual basis renders the plea involuntary.  However, the trial court's aggravation findings were not a *direct* consequence of the plea, but rather the result of a separate, discretionary proceeding during which Petitioner retained all his constitutional rights and the burden was on the prosecution to establish aggravating factors beyond a reasonable doubt.  Petitioner did not admit the existence of the (F)(6) aggravating factor in his plea, and the trial court was under no obligation to find this factor proven beyond a reasonable doubt.  That Petitioner admitted facts from which the judge ultimately found the (F)(6) factor is not the same as stipulating to the existence of the factor.  *Cf. Adams v. Peterson*, 968 F.2d 835, 839 (9th Cir. 1992) (en banc) ("A stipulation to facts from which a judge or jury may *infer* guilt is simply not the same as a stipulation *to* guilt, or a guilty plea.").  Because Petitioner's plea had only collateral consequences on the aggravation phase of sentencing, no constitutional violation arose out of the court's failure to advise Petitioner of the possibility he would be found eligible for the death penalty as a result of the

1  admissions contained in the plea's factual basis.  Petitioner has failed to show that there was

2  no reasonable basis for the state court to deny relief on this claim.

3  **III.     INEFFECTIVE ASSISTANCE OF COUNSEL**

4         Petitioner contends that he was denied his Sixth Amendment right to the effective

5  assistance of counsel when counsel failed to investigate and present mitigating evidence

6  (Claim 2), investigate and rebut the (F)(6) "heinous, cruel, or depraved" aggravating factor

7  (Claim 3), and properly advise him about the consequences of his plea, stipulated factual

8  basis, and sentencing stipulation (Claim 4).  Petitioner also asserts cumulative prejudice from

9  counsel's alleged deficient performance (Claim 5).

10        **A.     Failure to Investigate and Present Mitigating Evidence**

11        Petitioner alleges that sentencing counsel failed to competently investigate and present

12  substantial mitigating evidence.  He further alleges that counsel failed to select competent

13  mental health and substance abuse experts and provide them with his social history.

14  Petitioner argues that competent experts would have explained how mental disorders and

15  substance abuse played a role in the commission of the offense and, consequently, would

16  have established the (G)(1) substantial impairment mitigating factor.  (Doc. 35 at 53.)

17  Respondents concede exhaustion except to the extent Petitioner alleges that counsel was

18  ineffective for failing to retain a neuropsychologist.  It appears to this Court from its review

19  of the PCR record, including the evidence and arguments presented during the state court

20  evidentiary hearing, that the entirety of Claim 2 was exhausted.

21        Relevant Facts

22        Petitioner was represented at sentencing by Maricopa County Deputy Public

23  Defenders Emmet Ronan and Sylvina Cotto.  During PCR proceedings, Petitioner alleged

24  that counsel provided constitutionally ineffective representation by failing to investigate and

25  present substantial mitigating evidence and failing to provide Petitioner's social history to

26  competent mental health and substance abuse experts.  (Doc. 38-10 at 11.)  The PCR court

27  found this to be a colorable claim and held a four-day evidentiary hearing in January 2010.

28        At the hearing, Petitioner called as witnesses two of his siblings, four experts, trial

counsel Ronan, and mitigation specialist Pamela Davis.  The State presented testimony from a psychologist.  In addition, the parties stipulated to admission of deposition transcripts, in lieu of live testimony, from co-counsel Cotto and a mental health expert who evaluated Petitioner before sentencing.  (Doc. 43-10 at 21.)  The parties also agreed to the admission of numerous exhibits, including the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA Guidelines), pre-sentencing psychological reports, post-conviction expert reports, and a 1986 psychological evaluation.  (Doc. 43-9 at 2-3.)

*Evidence Regarding Counsel's Investigation*

Mitigation specialist Davis testified that she began working as a non-capital mitigation specialist for the Maricopa County Public Defender in 1991, after having worked more than five years in adult probation departments.  (Doc. 39-9 at 12.)  Before being recruited by Ronan to assist in Petitioner's case, she had worked on only one capital case.  Davis recalled meeting frequently with Petitioner at the jail and traveling to Alabama, Nevada, and Utah to interview family members and obtain records.  Davis said she did not meet with any of the experts retained by counsel to evaluate Petitioner and did not know whether they were given any of the background information she had compiled.  (*Id.* at 20-21.)  However, Davis also testified that at the time she began working on Petitioner's case in 1998, mitigation specialists were not commonly used in capital cases and she believed her role was to compile a written social history for presentation to the court, not to recommend experts to counsel.  (*Id.* at 37-38.)  Trial counsel Ronan also testified that in 1999 the concept of a capital mitigation specialist was new in his public defender office.  (Doc. 40-6 at 11-12.)

Petitioner's brother, Allen Sansing, and one of his sisters, Susan Mitchell, testified that they recalled meeting jointly with Davis in Alabama prior to Petitioner's sentencing. Allen told Davis about his mother's alcohol abuse, methods of discipline, husbands, and problems the children encountered with their stepfathers.  (Doc. 39-8 at 55-56.)  Likewise, Susan told Davis everything she believed was important about their upbringing, including Petitioner's drug use and their mother's neglect and beatings.  (Doc. 39-9 at 1-3.)

1       In addition to investigating Petitioner's social history, trial counsel consulted three

2   mental health experts.   Dr. Sara Hill, a clinical psychologist, was asked to determine

3   Petitioner's competency to stand trial or plead guilty.   In her report, Dr. Hill noted that

4   Petitioner said he had a long history of using marijuana, was on probation for a drug charge

5   prior to the murder, and went from smoking marijuana to smoking crack cocaine, which he

6   was doing "all day long at the time of his arrest."   (Doc. 41-8 at 12.)   She found Petitioner

7   to be "quite conversant in discussing legal matters" and "unequivocally competent to stand

8   trial."   (*Id.* at 13.)   She further found that Petitioner had a history of antisocial behaviors, but

9   required more background information to make a diagnosis of antisocial personality disorder.

10  (*Id.*)

11      Dr. Katherine Menendez, a psychologist, evaluated Petitioner "for the purpose of

12  establishing learning capacity and the presence of a learning disorder."   (Doc. 41-8 at 15.)

13  In the background section of her report, Dr. Menendez described Petitioner as saying that his

14  mother had "treated him well," that he recalled only one incident of harsh physical discipline

15  from his first stepfather, that he had a "normal" early family life, and that he had been an

16  "average" student.   (*Id.* at 15-16.)   Petitioner reported that he began smoking crack cocaine

17  at age 28 and became "very paranoid, violent and hypersexual."   (*Id.* at 17.)   Dr. Menendez

18  determined that Petitioner had a full scale IQ of 80, which is below average, but that he did

19  not appear to have a "pronounced, significant learning disorder."   (*Id.* at 20.)   She also

20  diagnosed Petitioner with cocaine abuse in remission and an antisocial personality disorder.

21      Lastly, defense counsel enlisted the assistance of Dr. Susan Parrish, a psychologist

22  specializing in neuropsychological testing and post-traumatic stress disorder.   (Doc. 40-7 at

23  30.)   Dr. Parrish retained notes from her presentence interview with Petitioner, but could not

24  recall whether she performed any tests, made a diagnosis, or prepared a report.   (*Id.* at 8.)

25  However, she believed she was asked to meet with Petitioner to determine whether he

26  displayed any obvious psychological difficulties and that "nothing jumped out at me that he

27  had any difficulties" such as an "obvious neuropsychological symptom" that would have

28  justified more testing or that needed to be pursued.   (*Id.* at 17-18, 26-27.)

1    Trial counsel Ronan had few specific recollections of his conversations with the

2    experts and did not know whether he had provided Petitioner's social history to Dr. Hill or

3    school records to Dr. Menendez. (Doc. 40-5 at 63, 68, 71.) He testified that it was his usual

4    custom and practice to provide background information to consulting experts, but

5    acknowledged statements in Dr. Menendez's report about Petitioner's upbringing, such as

6    being an average student and getting along well with his mother, that contradicted

7    information compiled by Davis. (Doc. 40-6 at 7, 17-18.) Although he had no recall of

8    speaking with Dr. Menendez, Ronan testified that he did not consider a diagnosis of

9    antisocial personality disorder to be mitigating and "[b]ased on the report as I have now seen

10   it, I would not see any reason to call her." (*Id.* at 8.) He also acknowledged that evidence

11   concerning an antisocial personality disorder generally opens the door for prosecutors to

12   proffer evidence of bad acts consistent with that diagnosis. (*Id.* at 30.) Regarding Dr.

13   Parrish, Ronan believed it likely she found nothing helpful after meeting with Petitioner

14   because otherwise he would have had her prepare a report and testify at the sentencing

15   hearing. (*Id.* at 9.) He also would have consulted with others types of experts if Dr. Parrish

16   had made such a recommendation. (*Id.* at 9-10.)

17   Regarding Petitioner's drug use, Ronan believed the information that Petitioner had

18   purchased $750 of crack cocaine in the four days prior to the offense was presented to the

19   sentencing judge in Davis's mitigation report. (Doc. 40-5 at 82-83.) Ronan did not know

20   whether Dr. Parrish had relayed to counsel that Petitioner told her he had spent $2,000 during

21   the same time period, as reflected in her interview notes. (*Id.* at 73-74.) In response to a

22   question as to why he did not enlist and present testimony from experts in child development

23   and pharmacology, Ronan said he had no recollection of why those types of experts were not

24   utilized:

25       [M]y best guess is that I felt that Judge Reinstein, with his background and
         experience would understand the information that was going to be presented
26       in Pam Davis's letter, that with his background and experience he understood
         the nexus between substance abuse and the commission of crimes, substance
27       abuse and dysfunctional childhood, and those types of things, and that it was
         simply going to be a question of whether he found that significant enough as
28       a mitigating factor to outweigh the aggravate [sic] factors.

(*Id.* at 84; Doc. 40-6 at 1.)  In hindsight, he would not have made the same decisions on how mitigation evidence was presented to the sentencing judge.  (Doc. 40-6 at 5.)

In her deposition, co-counsel Cotto said that her representation was limited to drafting the aggravation section of the presentencing memorandum and that Ronan was teaching her how to handle a capital case.  (Doc. 40-6 at 46.)  She recalled that Ronan was "very clear" that the mitigation investigation "needed to begin from the very onset."  (*Id.*)  Cotto had no recollection of meeting with experts but, after reviewing Dr. Menendez's report, did not believe her diagnosis of antisocial personality disorder was mitigating.  (*Id.* at 50.)  She recalled meeting with Ronan to "discuss things as they developed and trying to figure out what could be useful or not" and also recalled discussing Dr. Parrish, but had no specific recollection of what was said.  (*Id.* at 50-51.)

Petitioner's *Strickland* expert, Vicki Liles, testified that counsel's failure to provide experts with background information, retain a substance abuse expert, and engage a psychologist to "pull all [the background information] together" fell below the standard of care for a capital defense attorney at the time of Petitioner's sentencing.  (Doc. 40-4 at 3-8.) She further opined that antisocial personality disorder is mitigating and that counsel was ineffective for failing to present that diagnosis at sentencing.  (*Id.* at 15.)  In addition, Liles suggested that counsel was ineffective for failing, in light of Petitioner's substance abuse, to obtain a neuropsychological examination at the start of the case because a brain can "heal and can repair itself."  (*Id.* at 21.)

At the time of Petitioner's offense, Liles was employed by the Maricopa County Public Defender but had no involvement in Petitioner's case because she had a "more generalized caseload at that time."  (Doc. 40-3 at 53.)  She recalled that sometime in 1998 or 1999, her office formed a major felony unit comprised of three attorneys, including Ronan. When Petitioner was sentenced in 1999, Liles had tried only one capital case through sentencing and that was as second chair in an effort to become qualified to serve as lead counsel in a capital case.  (Doc. 40-4 at 88-89.) In a declaration proffered to the PCR court, Liles opined that "it was standard practice to use the services of a mitigation specialist in

1   capital representation in 1998 and 1999" and that the "specialist would then locate and

2   suggest the participation of necessary experts." (Doc. 43-4 at 4.)  However, at the PCR

3   hearing, she acknowledged that under the 1989 ABA Guidelines in effect at the time a

4   "mitigation specialist wasn't really required as part of the defense team." (Doc. 40-3 at 71-

5   72.)

6        *Mitigation Evidence*

7        Petitioner's brother Allen and sister Susan testified at the PCR hearing.  Each

8   described their mother as a self-centered woman, who showed no love or affection, who on

9   occasion abandoned and regularly neglected their basic needs, and who routinely hit them

10  with belts and sticks for perceived infractions. (Doc. 39-8 at 14-86.) They also reported that

11  their mother drank heavily, had numerous failed marriages, and frequently fought with her

12  husbands.  One of their stepfathers liked to pick fights and beat up on Allen and Petitioner.

13  Each saw Petitioner begin to use marijuana and inhalants when he was around 10 or 11 years

14  of age.  Allen left home at age 17, when Petitioner was about 11, and Susan left home and

15  moved in with Allen when she was 14 and Petitioner was 13.

16       Petitioner also presented testimony from three new experts.  Dr. Paul Miller, a

17  developmental psychologist, interviewed Petitioner, Allen, and Petitioner's sister Patsy.

18  Based on these interviews as well as Davis's mitigation report, Davis's notes, and

19  Petitioner's school records, Miller prepared a 60-page developmental assessment report that

20  examined the nature of the risk factors to which Petitioner was exposed as a child and the

21  relationship of those factors to later negative outcomes, such as conduct disorders and drug

22  abuse. (Doc. 39-9 at 63-64.)  In summary, Dr. Miller opined that various life stressors,

23  including parental neglect, harsh discipline, exposure to domestic violence, maternal alcohol

24  abuse, frequent changes in residences and maternal marital relationships, and extreme

25  poverty led Petitioner to use drugs as a coping mechanism. (Doc. 39-6 at 17-20.)  Because

26  he focused only on Petitioner's adolescent development, Dr. Miller had no opinion on the

27  role Petitioner's risk factors played in the offense. (Doc. 40-1 at 11.)

28       Dr. Edward French, a pharmacologist, testified regarding the physiological effects of

- 34 -

cocaine.  Although Petitioner did not tell him the amount of crack cocaine he consumed prior to the offense, Dr. French opined that Petitioner was in a cocaine-induced psychosis when he attacked and killed the victim.  (Doc. 40-3 at 26-27.)  As support for this conclusion, Dr. French cited statements made by Petitioner that (1) his heart was racing so fast during the offense that he thought he would die (classic physiological effect of cocaine); (2) he believed the victim knew his intentions based on an innocuous gesture to his wife (evidence of paranoia); and (3) he had "no conscious there" during the attack (indicating a break in reality).  (*Id.* at 30-33.)  In conclusion, Dr. French stated that drugs "hijack the brain," cause "pronounced behavioral and cognitive changes," take over the behavior of an individual, and diminish the ability "to process information correctly."  (*Id.* at 33-34.)  On cross-examination, Dr. French acknowledged that he was not qualified to diagnose mental disease or defects and that the information about the effects of cocaine included in the mitigation specialist's report to the sentencing judge was accurate.  (*Id.* at 35, 39.)

    Dr. Richard Lanyon, a forensic and clinical psychologist, also testified.  (Doc. 40-4 at 36-84; Doc. 40-5 at 1-43.)  On the basis of record review, interviews, and psychological testing, Dr. Lanyon prepared a lengthy report in which he concluded that Petitioner's profile "suggests the likelihood of a significant anxiety disorder, depression, and thought disorder" but "does not indicate antisocial characteristics or the likelihood of impulsive acting-out." (Doc. 39-6 at 43.)  He determined that Petitioner has a full scale IQ of 87, placing him in the low-average range of intelligence.  (*Id.* at 43-44.)  He also found no suggestion of impaired functioning due to brain damage.  (*Id.* at 44.)

    With regard to the offense, Dr. Lanyon opined it was highly probable that, as a result of a cocaine-induced delusional psychotic state as well as a paranoid personality disorder, Petitioner's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly diminished.  (*Id.* at 45.)  Similar to Dr. French, Dr. Lanyon based this opinion on the "serious and pivotal cognitive distortion" that the victim knew he was going to do something to her.  (*Id.*)  According to Petitioner's account to Dr. Lanyon, he made a hand gesture to his wife signifying that the victim's purse

was not in her truck, that there was "no way anyone could read that to mean anything," but nonetheless he "became convinced that the [victim] somehow knew what it was and was going to, therefore, turn him in."  (Doc. 40-4 at 56-57.)

> He has a delusion she knows exactly what he intends to do, and, in fact, these thoughts are in his mind and it suggests that he feels very guilty about them, then he becomes delusional that she knows exactly what's going on, it's in her mind, too, and he then finds himself in these unusual physiological reactions which signal, to me, are a likelihood of a cocaine induced psychosis, which a major aspect of that is delusions.

(*Id.* at 74-75.)

Dr. Lanyon opined that this paranoid delusion caused Petitioner to enter into a severely abnormal mental state, as evidenced by Petitioner's statements that "[i]t was not me" and that he had no thoughts or feelings when he attacked her.  Rather, there was "[c]omplete blackness.  I stepped into a hole . . . everything's dark."  (Doc. 39-6 at 41.)  Petitioner told Dr. Lanyon that he had no control over the initial attack and that his subsequent actions were done out of panic.  (*Id.* at 42.)  In Dr. Lanyon's opinion, Petitioner remained in a psychotic state while taking deliberate actions not to get caught.  (Doc. 40-5 at 8-10.)  Regarding antisocial personality disorder, Dr. Lanyon declined to make such a diagnosis, but acknowledged there were "enough symptoms or characteristics" to put him into that category.  (*Id.* at 19-20.)  Finally, Dr. Lanyon concluded that Petitioner's cocaine use was a product of the extreme dysfunction in his childhood environment and thus "the effects of his childhood environment can also be considered to be a causal factor in significantly diminishing his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."  (Doc. 39-6 at 46.)

The State presented Dr. Michael Bayless in rebuttal.  Dr. Bayless determined that Petitioner has a full scale IQ of 88 and found no indication of neurological impairment.  (Doc. 43-9 at 11.)  In his report, Dr. Bayless concluded that Petitioner has a personality disorder not otherwise specified, with antisocial and obsessive compulsive traits.  He changed his diagnosis to an antisocial personality disorder after reviewing a 1986 psychological evaluation conducted as part of a diagnostic evaluation for the Utah

1    Department of Corrections.  (Doc. 40-1 at 29.)  In that report, clinical psychologist Dr.

2    Donald Long diagnosed Petitioner, then 18 years old, with a conduct disorder and extreme

3    emotional immaturity.  (Doc. 44-2 at 20.)  He also derived an abstract IQ of 89.  (*Id.* at 19.)

4         Dr. Bayless's interview notes reveal that Petitioner relayed essentially the same story

5    regarding the offense as he told to Drs. French and Lanyon, namely that he made a motion

6    to his wife to indicate "there's nothing [in the victim's truck]," that the victim "saw and got

7    spooked and said I've got to go," and that when she turned toward the door, "the darkness

8    came over me, heart racing, and I grabbed her in bear hug."  (Doc. 44-2 at 9; Doc. 40-2 at

9    10.)   The notes also reported Petitioner as saying that he "crossed line—blackness

10   clearing—on probation, hit her with wooden pole." (Doc. 44-2 at 9; Doc. 40-2 at 13.)  Dr.

11   Bayless testified that when he asked Petitioner why he raped her, Petitioner smiled and

12   gestured in a way that angered Dr. Bayless, who interpreted the gesture to mean "seeing a

13   vaginal area would make me do such a thing."  (Doc. 40-1 at 45.)  In relaying this

14   impression, Dr. Bayless stated that the victim's dress had flown up.  (*Id.*)  On cross-

15   examination, Dr. Bayless acknowledged that the victim had not been wearing a dress and that

16   his notes did not include this aspect of Petitioner's statement, but that he remembered it

17   "precisely" and despite the inaccuracy concerning her clothing was "what [Petitioner] said

18   to me."  (Doc. 40-2 at 15-16.)

19        Addressing antisocial personality disorders, Dr. Bayless testified that such a disorder

20   would not render a person incapable of knowing right from wrong or from having the ability

21   to control his or her conduct.  (Doc. 40-1 at 53.)  Rather, "it's choice issues"—such

22   individuals know what's right, know what is acceptable, but choose not to act appropriately.

23   (*Id.*)  He further testified that the "central feature of a substance induced psychotic disorder

24   are hallucinations and delusions that are due to the direct physiologic effects of [the]

25   substance" and that in this case Petitioner "knew exactly what was going on.  He was not

26   seeing things.  He was not hearing voices.  He was not delusional." (*Id.* at 48.)  Dr. Bayless

27   concluded that Petitioner was "fully aware of what he was doing" when he committed the

28   offense and "knew it was wrong."  (*Id.* at 46.)

1

2

> He explained to me, he talked about it very clearly. He remembered the essence of what had taken place. He was very much focused. He was very much in reality when we talked about what happened on the day of the offense.

3

4

5

> Look, there is no indication that he was suffering from any psychosis. There is no indication that he did not know what he was doing. There is no indication that cocaine played a role in his behavior, his choices at the time. Was he high on cocaine? He had done some cocaine. But was he at a point where now he did not know what he was doing? No.

6

7

8

9

> His voluntary intoxication at that time was voluntary intoxication, but he was not at a level that he did not know what he was doing. Pure and simple. He knew why he moved the car. He knew why he put a blanket over her stomach when he stabbed her. He knew what he was doing when he raped her. He said to me specifically: I'm going to make this look—I wanted to make this look like she was raped in a robbery. He said that to us specifically, that he thought that before he did it. I don't know what all the fight is about.

10

(Doc. 40-2 at 29.)

11

*State Court Ruling*

12

Following the hearing and submission of post-hearing memoranda, the state PCR

13

court denied relief in a 15-page ruling. (Doc. 38-9.) After setting forth in detail the standard

14

for relief under *Strickland v. Washington*, 466 U.S. 668 (1984), the court addressed the

15

credibility of the expert opinions. It found that much of "Dr. French's opinions were based

16

on speculation about the quantity of cocaine that was used by the Defendant." (Doc. 38-9

17

at 35-36.) It further found that Dr. Lanyon's opinions "were less than persuasive." (*Id.* at

18

36.) Specifically the court wrote:

19

20

21

22

23

24

25

26

> Dr. Lanyon believed that Sansing's statement to him that everything went black and blank was a strong indication of psychosis. [Footnote 20: Sansing's trial attorney testified at the evidentiary hearing that he does not ever recall Sansing saying this to him. If Sansing had said this to him, he would have followed up on these statements.] However, Dr. Lanyon's opinions were contradicted by Dr. Michael Bayless (a psychologist called by the state) and several versions of the facts of the crime provided by Sansing in which he remembers many details after the alleged "going black" episode. Dr. Bayless opined that the Defendant suffered from a classic anti-social personality disorder, that Sansing was high on cocaine at the time of the crime, but that he knew what he was doing was wrong. Significantly, Sansing smiled as he described to Dr. Bayless the reason why he committed the rape: he saw Trudy Calabrese's vaginal area. Sansing also described that he placed a blanket over Trudy to stab her so as to avoid blood splatter. This court finds the testimony of Dr. Bayless to be the more credible and more persuasive.

27

(*Id.* at 36-37.)

28

Addressing *Strickland*'s performance prong, the PCR court noted that trial counsel

had consulted with three different mental health experts, one of whom diagnosed Petitioner with an antisocial personality disorder and another who recalled no issues that required further testing.  The court noted that although Ronan could not recall what information he supplied to Dr. Menendez, he did not doubt supplying her with any available records, as was his standard practice.  The court further noted Ronan's belief that proffering evidence of an antisocial personality disorder as mitigation would have opened the door to the prosecution submitting evidence of Petitioner's other violent, antisocial acts.  "This type of 'double-edged' mitigation evidence would be more detrimental than helpful, and making a strategic decision to avoid damaging a case for mitigation despite losing a slim advantage cannot be unreasonable."  (*Id.* at 38-39.)  Regarding counsel's failure to utilize expert witnesses, the court credited Ronan's belief that the trial judge's background and experience would allow him to understand the nexus between Petitioner's difficult childhood, his drug use, and the murder.

In conclusion, the court stated:

> [T]he issue presented is whether Sansing's counsel performed deficiently, or rather, unreasonably based on the information he knew at the time, and based on the extent of his investigations and reliance on medical and mental health experts.  Based on the factual accounts from the evidentiary hearing, counsel appears to have acted reasonably, even though no expert witnesses were called during the mitigation phase to attempt to create a causal nexus between Sansing's drug usage, tough childhood and antisocial personality disorder and the crime.  This court finds that the testimony of Dr. Paul Miller regarding the Defendant's abusive childhood was duplicative of the investigation of Pamela Davis.  The court further finds that the proposed expert testimony such as that offered by Drs. French and Lanyon regarding the effects and nexus between Defendant's cocaine use and the commission of the crime to be speculative and unpersuasive.   The evidence of a "cocaine-induced psychosis" is speculative at best.  Many of the facts upon which Dr. Lanyon based his testimony were quite effectively disputed by Dr. Michael Bayless.   Dr. Bayless' opinions (including those disputing that any psychosis existed at the time of the crime given Sansing's detailed memory of what had occurred) were far more credible and reasonable.  More importantly, [trial counsel] did not call expert witnesses for strategic or tactical reasons.   I find no deficient performance by trial counsel.

(*Id.* at 39-40.)

Turning to *Strickland*'s prejudice prong, the court found that, even assuming counsel performed deficiently in failing to investigate and call experts, Petitioner had failed to

1    demonstrate a reasonable probability of a different outcome.  First, it concluded that, in light
2    of his attempts to avoid prosecution, expert testimony connecting his dysfunctional
3    upbringing to the offense would not have established that he was unable to appreciate the
4    wrongfulness of his actions or to conform his conduct to the requirements of the law.
5    Specifically, the court noted that Petitioner moved the victim's truck, lied and gave false
6    information when asked about the victim's whereabouts, and hid the body.  Analogizing to
7    decisions by the Arizona Supreme Court in other capital cases, the PCR court concluded that
8    each of these actions "was performed in order to elude suspicion and avoid prosecution" and
9    "clearly demonstrated that he fully appreciated the wrongfulness of his conduct."  (*Id.* at 41-
10   42.)

11          Similarly, the court found that expert testimony concerning cocaine intoxication
12   would not have established that he was unable to conform his conduct to the requirements
13   of the law due to drug impairment at the time of the offense.  Again referencing a state
14   supreme court case, the court noted that most of the testimony about Petitioner's drug use
15   was derived from Petitioner himself.  Because of Petitioner's "motive to fabricate self-
16   serving testimony," this evidence would have been met with skepticism.  (*Id.* at 42-43.)  The
17   court also observed that although "no expert testified about Sansing's tough childhood, drug
18   use, anti-social personality disorders or a causal nexus between his personality disorder and
19   the crime, the *factual information* regarding Sansing's difficult childhood, his drug use, and
20   the crime was presented to the sentencing judge."  (*Id.* at 43.)  Finally, the court found that
21   the murder was "horribly cruel" and that even if all of the proffered mitigating circumstances
22   were proven, no reasonable jury would find the mitigation sufficiently substantial to
23   outweigh the aggravation.  (*Id.* at 43-44.)

24          Controlling Law

25          As recognized by the state court, claims of ineffective assistance of counsel are
26   governed by the principles set forth in *Strickland*.  To prevail, a petitioner must show that
27   counsel's representation fell below an objective standard of reasonableness and that the
28   deficiency prejudiced the defense.  466 U.S. at 687-88.

1     The inquiry under *Strickland* is highly deferential and "every effort [must] be made

2     to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

3     challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

4     at 689; *see Wong v. Belmontes*, 130 S. Ct. 383, 384 (2009) (per curiam); *Bobby v. Van Hook*,

5     130 S. Ct. 13, 16 (2009) (per curiam).  Thus, to satisfy *Strickland*'s first prong, a defendant

6     must overcome "the presumption that, under the circumstances, the challenged action might

7     be considered sound trial strategy."  *Id.*  "The test has nothing to do with what the best

8     lawyers would have done.  Nor is the test even what most good lawyers would have done.

9     We ask only whether some reasonable lawyer at the trial could have acted, in the

10    circumstances, as defense counsel acted at trial." *Id.* at 687-88.

11    With respect to *Strickland*'s second prong, a petitioner must affirmatively prove

12    prejudice by "show[ing] that there is a reasonable probability that, but for counsel's

13    unprofessional errors, the result of the proceeding would have been different.  A reasonable

14    probability is a probability sufficient to undermine confidence in the outcome." *Strickland*,

15    466 U.S. at 694.  "When a defendant challenges a death sentence . . . the question is whether

16    there is a reasonable probability that, absent the errors, the sentencer . . . would have

17    concluded that the balance of aggravating and mitigating circumstances did not warrant

18    death."  466 U.S. at 695.  In *Wiggins v. Smith*, the Court further noted that "[i]n assessing

19    prejudice, we reweigh the evidence in aggravation against the totality of available mitigating

20    evidence."  539 U.S. 510, 534 (2003); *see also Mayfield v. Woodford*, 270 F.3d at 928.  The

21    "totality of the available evidence" includes "both that adduced at trial, and the evidence

22    adduced" in subsequent proceedings. *Wiggins*, 539 U.S. at 536 (quoting *Williams v. Taylor*,

23    529 U.S. 362, 397-98 (2000)).

24    Under the AEDPA, this Court's already-deferential review of trial counsel's

25    performance is subject to another level of deference under § 2244(d) and is thus "doubly"

26    deferential.  *Richter*, 131 S. Ct. at 788 (quoting *Knowles v. Mirzayance*, 129 S. Ct. 1411,

27    1420 (2009)).  Therefore, to establish entitlement to relief, Petitioner must make the

28    additional showing that the PCR court, in ruling that trial counsel was not ineffective, applied

1  *Strickland* in an objectively unreasonable manner.  In making this determination, "the

2  question is not whether counsel's actions were reasonable," but "whether there is any

3  reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*  Because

4  the *Strickland* standard is a general one, "the range of reasonable applications is substantial."

5  *Id.*

6      <u>Analysis</u>

7      Petitioner first asserts that the PCR court made no findings of fact nor reached any

8  conclusions of law on his allegations concerning counsel's failure to investigate and to

9  present Petitioner's social history to the experts, and that he is thus entitled to *de novo* review

10  on these claims.  However, it is apparent from the record that the court at least implicitly

11  ruled on these allegations when it stated that "the issue presented is whether Sansing's

12  counsel performed deficiently, or rather, unreasonably based on the information he knew at

13  the time, and based on the extent of his investigations and reliance on medical and mental

14  health experts."[5]  (Doc. 38-9 at 39.)  In addition, the court described the extent of counsel's

15  investigation and noted counsel's testimony regarding his standard practice with respect to

16  providing background information to experts.  In the absence of a clear indication that the

17  state court declined to reach the merits of Petitioner's claim, this court "must assume that the

18  state court has decided all the issues."  *Murdoch v. Castro*, 609 F.3d 983, 990 n.6 (9th Cir.

19  2010) (en banc) (plurality opinion); *see Muth v. Frank*, 412 F.3d 808, 815 (7th Cir. 2005)

20  ("An adjudication on the merits is perhaps best understood by stating what it is not:  it is not

21  the resolution of a claim on procedural grounds."); *see also Miller-El v. Cockrell*, 537 U.S.

22  322, 347 (2003) (noting that "a state court need not make detailed findings addressing all the

23

24      [5]  The court also described Petitioner's claim as failing "to fully investigate and

25  develop possible mitigating factors, because expert witnesses were not presented," failing

26  "to utilize an expert to explain his difficult childhood and polysubstance abuse," failing "to

establish a causal nexus between Sansing's upbringing, antisocial personality disorder and

27  the crime," failing to consult "with an expert in cocaine addiction," and failing "to produce

an expert to develop the causal nexus between his substance abuse and the crime."  (Doc. 38-

28  9 at 35.)

evidence before it"); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (holding that "Federal habeas review is not *de novo* when the state court does not supply reasoning for its decision").

Addressing review under § 2254(d), Petitioner argues that the PCR court unreasonably applied *Strickland* in finding neither deficient performance nor prejudice. He further asserts that the state court's decision was based on the following seven instances of "unreasonable" factual determinations:

(1)    The court's implicit determination that Ronan provided background information to Dr. Menendez, despite the discrepancies between her report and the available information concerning Petitioner's academic performance and relationship with his mother;

(2)    The court's adoption of Dr. Bayless's account that Petitioner raped the victim because he saw her vaginal area when her dress flew up, despite the fact the victim had not been wearing a dress, Petitioner had not relayed seeing her vaginal area in any of his previous statements about the offense, and the absence of this alleged statement in Dr. Bayless's report and interview notes.

(3)    The court's determination that Dr. Bayless was more credible than Petitioner's experts, in light of Dr. Bayless's testimony the victim was wearing a dress, his assertion that Petitioner suffered from no mental illness despite antisocial personality disorder being identified in the DSM as a mental illness, his unfounded assertions concerning the cost and amount of cocaine used by Petitioner, and his unprofessional personal feelings against Petitioner;

(4)    The court's determination that Dr. French's opinion was based upon speculation about the quantity of cocaine used by Petitioner, despite Dr. French testifying that his opinion was not based on the amount of drugs Petitioner consumed;

(5)    The court's finding that trial counsel chose to not offer the diagnosis of antisocial personality disorder as a mitigating factor because it could have opened the door to damaging rebuttal evidence, given that Ronan did not expressly testify he made such a decision in Petitioner's case, only that he agreed generally that prior bad acts would be part of the calculus an attorney would consider in deciding whether to present evidence of an antisocial personality disorder;

(6)    The court's finding that Dr. Miller's report was duplicative of that prepared by the mitigation specialist, given that as a developmental psychologist Dr. Miller's report "goes much further" than Davis's investigation and had a different purpose; and

(7)    The court's finding that trial counsel made a tactical decision not to present expert witnesses, given that Ronan had no recollection of why he did not do so.

(Doc. 35 at 58-67.)

1    Under the standard set forth in § 2254(d)(2), a state court decision "based on a factual

2  determination will not be overturned on factual grounds unless objectively unreasonable in

3  light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340

4  (2003); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) ("[A] federal court may not

5  second-guess a state court's fact-finding process unless, after review of the state-court record,

6  it determines that the state court was not merely wrong, but actually unreasonable."). A state

7  court's factual determination "is not unreasonable merely because the federal habeas court

8  would have reached a different conclusion in the first instance." *Wood v. Allen*, 130 S. Ct.

9  841, 849 (2010). "This is a daunting standard—one that will be satisfied in relatively few

10  cases." *Taylor*, 366 F.3d at 1000.

11    *Counsel's Performance*

12    After reviewing the entirety of the record, this Court concludes that the state court

13  reasonably determined that Ronan made a tactical decision, after conducting a reasonable

14  investigation, not to present evidence of an antisocial personality disorder or to utilize expert

15  witnesses to testify concerning Petitioner's difficult childhood, drug addiction, and cocaine

16  intoxication at the time of the offense.

17    The evidence at the PCR hearing established that counsel consulted three different

18  experts. Dr. Hill's report indicated that she was retained to determine Petitioner's

19  competency to stand trial or plead guilty. Dr. Menendez's report stated that she was asked

20  to determine whether Petitioner suffered from a learning disability. Neither counsel nor Dr.

21  Parrish could recall her role in the case, but given her specialization in neuropsychology and

22  post-traumatic stress disorder, it is not unreasonable to conclude that she was on the lookout

23  for problems in these areas.

24    In addition, counsel enlisted a mitigation specialist to investigate and prepare a

25  detailed social history report. According to Davis's report, she had extensive personal

26  interviews with Petitioner and his wife, mother, father, stepmother, brother, three sisters, and

27  several aunts and uncles. She described Petitioner's positive relationship with the only

28  significant male figure in his life—a maternal grandfather who died unexpectedly when

Petitioner was seven years old.  She relayed that between the ages of six and 14, Petitioner lived in a very unstable home, that his mother went through a succession of relationships with men, none of which were positive or supportive, that they lived in poverty, and that Petitioner's mother did not permit his father to have contact with Petitioner and his siblings. Davis recounted that Petitioner's mother "forbid her children to play outside or have friends in their home" and that there was one instance when a welfare worker arrived unannounced and found their living conditions to be "unacceptable."  Describing Petitioner's mother's marriage to her second husband, when Petitioner was between the ages of six and ten, Davis reported that Petitioner's stepfather was an extremely abusive alcoholic, who would spend the weekends drinking and fighting with his wife.  During these times, Petitioner and his siblings would be denied food and sleep until the fighting ended for the night, and Petitioner's mother would forbid her children from eating or going to bed until a fight was resolved.  The mitigation report also detailed Petitioner's juvenile criminal history, poor academic record, drug use beginning in the fifth grade, relationship with Kara Sansing, adult criminal history, and crack cocaine addiction.

Petitioner argues it was unreasonable for the court to implicitly find that Ronan provided this background information to Dr. Menendez.  However, while Dr. Menendez's report contains some factual discrepancies compared to the information gathered by mitigation specialist Davis, this Court cannot say that the state court's finding was objectively unreasonable in light of Ronan's testimony concerning his standard practice of providing available background materials to experts and his having no reason to believe he did not follow this practice in this case.  Because Dr. Menendez did not testify at the PCR hearing, there is no way to know whether she was given background materials but for whatever reason neglected to review them.  Nor is there anything in the record to suggest that counsel failed to provide Petitioner's social history to Drs. Hill and Parrish; Dr. Hill did not testify and Dr. Parrish had no specific recollection.

In addition, Petitioner does not allege that any of the experts requested additional information, *see Hendricks v. Calderon*, 70 F.3d 1032, 1038 (9th Cir. 1995) (holding that

counsel does not have a duty to provide an expert with information necessary to reach a mental health diagnosis in the absence of a specific request to do so), or that the absence of any particular information precluded an accurate evaluation of Petitioner's mental state, *see Crittenden v. Ayers*, 624 F.3d 943, 965 (9th Cir. 2010) (noting that none of the experts suggested that additional background information or testing was necessary to accurately evaluate the defendant's mental health).   Nor does Petitioner assert how additional background information would have affected any of the expert's conclusions.

Petitioner argues that it was unreasonable for the court to find that Ronan made a strategic decision not to offer the diagnosis of antisocial personality disorder as a mitigating factor.   However, the record supports the state court's finding that Ronan likely concluded that the antisocial personality disorder diagnosed by Dr. Menendez would have harmed more than helped the mitigation case.   Although Ronan could not recall whether he considered presenting evidence of Petitioner's antisocial personality disorder, he testified that in his opinion such a diagnosis is not mitigating.   He also testified that evidence of an antisocial personality disorder generally opens the door for prosecutors to present evidence of prior bad acts consistent with that diagnosis.   Based on this testimony, it was not unreasonable for the state court to conclude that Ronan made a strategic decision in Petitioner's case not to call Dr. Menendez as a witness at sentencing.

Nor was it unreasonable for the state court to determine that the strategy itself was reasonable.   *Cf. Crittenden*, 624 F.3d at 968 n.15 (finding that counsel made tactical decision supported by adequate investigation to keep evidence of antisocial personality disorder away from sentencing jury).   The Ninth Circuit has repeatedly observed that evidence of an antisocial personality disorder may be potentially more harmful than helpful.   *See, e.g.*, *Daniels v. Woodford*, 428 F.3d 1181, 1204, 1210 (9th Cir. 2005) (suggesting that evidence the defendant may have been a sociopath was aggravating); *Beardslee v. Woodford*, 358 F.3d 560, 583 (9th Cir. 2004) (acknowledging that an antisocial personality diagnosis can be damaging); *Clabourne v. Lewis,* 64 F.3d 1373, 1384 (9th Cir. 1995) (noting that mental health records omitted from the sentencing hearing "hardly turned out to be helpful" because

1    they indicated that the defendant had an antisocial personality, not a thought disorder).  Here,

2    evidence of Petitioner's antisocial personality disorder would have opened the door to

3    Petitioner's history of antisocial behavior, including violence against his wife, involvement

4    of his children in other illegal activities, and other past crimes.  Thus, this case differs from

5    *Stankewitz v. Wong*, 698 F.3d 1163, 1174 (9th Cir. 2012), where the court found that

6    evidence of an antisocial personality would not have had a significant adverse impact

7    because the prosecution had "already painted a grim picture of Stankewitz's violent,

8    antisocial tendencies" and the jury had "heard next to nothing about Stankewitz's traumatic

9    childhood."

10           Petitioner also argues that the state court unreasonably determined that Ronan made

11   a strategic decision not to present expert witnesses to establish a nexus between Petitioner's

12   commission of the offense and his substance abuse and dysfunctional upbringing.

13   Information about Petitioner's dysfunctional upbringing, past substance abuse, and cocaine

14   use at the time of the crime were presented to the judge through the mitigation specialist's

15   report.  Although Ronan had difficulty remembering his exact thought process, he speculated

16   that he presented the mitigation case without experts because he believed the sentencing

17   judge had the background and experience to understand the connection between Petitioner's

18   background, drug abuse, and the crime.  This was sufficient evidence from which the state

19   court could reasonably conclude that counsel made a strategic decision.

20           Moreover, it was not objectively unreasonable for the state court to find that Ronan

21   acted reasonably in not utilizing expert witnesses to establish a nexus between Petitioner's

22   dysfunctional upbringing, drug abuse, and the crime.  *See Hurles v. Ryan*, No. 08-99032,

23   2013 WL 219222 (9th Cir. Jan. 18, 2013) (finding that "counsel did not perform below the

24   objective standard of care when she did not establish a causal nexus between Hurles's mental

25   conditions and the crime" because Supreme Court precedent did not require such a showing).

26   The connection between Petitioner's difficult childhood and drug addiction "was neither

27   complex nor technical.  It required only that the [judge] make logical connections of the kind

28   a layperson is well equipped to make."  *Wong v. Belmontes*, 130 S. Ct. 383, 388 (2009); *see*

*Fairbank v. Ayers*, 650 F.3d 1243, 1253 (9th Cir. 2011) (finding no ineffectiveness from counsel's failure to utilize an expert to link substance abuse and abusive childhood to the defendant's behavior during the crime); *see also Raley v. Ylst*, 470 F.3d 792, 803 (9th Cir. 2006) (noting that "the link between suffering abuse as a child and later committing abusive acts is not so esoteric as to be beyond the understanding of a lay jury"); *Nields v. Bradshaw*, 482 F.3d 442, 455-56 (6th Cir. 2007) (finding no ineffectiveness from counsel's failure to have an expert testify about the causal relationship between the defendant's alcoholism and his behavior on the night of the murder). In hindsight Ronan questioned whether he made the right decision on how the mitigation evidence was presented. However, this is insufficient to establish deficient performance under *Strickland*'s highly deferential standard.

In light of the record developed in state court, the Court concludes that the state court's finding of no deficient performance was based on neither an unreasonable application of *Strickland* nor an unreasonable determination of fact. Ronan could not recall many of the specifics of his decision-making process; however, there was sufficient other evidence in the record to support the state court's findings. *See Greiner v. Wells*, 417 F.3d 305, 326 (2nd Cir. 2005) ("Time inevitably fogs the memory of busy attorneys. That inevitability does not reverse the *Strickland* presumption of effective performance."); *see also Richter*, 131 S. Ct. at 790 ("Although courts may not indulge *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.") (internal quotation omitted). Counsel undertook a reasonable investigation and made strategic decisions about the evidence to proffer in mitigation and how that evidence would be presented. "A disagreement with counsel's tactical decisions does not prove that the representation was constitutionally deficient." *Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010).

*Prejudice*

In ultimately concluding that Petitioner was not prejudiced by any of counsel's alleged deficiencies, the state court made numerous findings, including that Dr. Bayless was more

1    credible than Dr. Lanyon, that the opinions of Drs. French and Lanyon regarding a cocaine-

2    induced psychosis were speculative and unpersuasive, that the proposed expert testimony

3    would not have established that Petitioner's ability to appreciate the wrongfulness of his

4    actions or to conform his conduct to the law's requirements was substantially impaired, that

5    Dr. Miller's report was duplicative of that prepared by the mitigation specialist, and that the

6    factual information regarding Petitioner's difficult childhood and drug abuse was before the

7    sentencing judge.

8          Petitioner takes issue with the state court's credibility determinations concerning the

9    experts, but federal courts have "no license to redetermine credibility of witnesses whose

10   demeanor has been observed by the state trial court, but not by them." *Marshall v.*

11   *Lonberger*, 459 U.S. 422, 434 (1983).  Even if reasonable minds reviewing a record might

12   disagree about a witness's credibility, "on habeas review that does not suffice to supersede

13   the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006).

14   Rather, "so long as 'fairminded jurists could disagree' on the correctness" of the state court's

15   credibility findings, Petitioner cannot demonstrate that these findings were objectively

16   unreasonable. *Richter*, 131 S. Ct. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664

17   (2004)).

18         Petitioner argues that it was objectively unreasonable for the PCR court to find that

19   Petitioner committed the rape after seeing the victim's vaginal area because Dr. Bayless

20   failed to document this alleged statement in his report or notes, Petitioner never made such

21   an assertion in his other numerous statements about the offense, and the victim was not

22   wearing a dress.  In making this finding, the state court concluded that Dr. Bayless was a

23   credible witness.  Because as discussed next it was not objectively unreasonable for the state

24   court to credit Dr. Bayless's testimony, none of Petitioner's alleged grounds are sufficient

25   to overturn the state court's determination that Petitioner raped the victim after seeing her

26   vaginal area.  Moreover, the state court's reference to Petitioner's alleged sexual arousal

27   played no significant role in its ultimate findings concerning counsel's representation.

28   Petitioner had also reported both to Dr. Bayless and other experts that he raped the victim in

order to make it look like she had been raped during a robbery. And it was this fact, separate from Petitioner's alleged arousal, that formed the basis of Dr. Bayless's opinion that Petitioner was fully aware of his actions when he committed the offense.

In a related argument, Petitioner asserts that it was objectively unreasonable for the state court to find Dr. Bayless more credible than Drs. Lanyon and French. However, this is a classic credibility determination to which this Court must defer so long as "fairminded jurists could disagree." *Richter*, 131 S. Ct. at 786. The essence of Petitioner's experts' testimony was that Petitioner entered a cocaine-induced psychotic state when Petitioner irrationally concluded that the victim could read his mind and was going to report him to the police. They based their conclusion on not only Petitioner having been on a crack binge for days, but also on his describing having "no conscious there" and experiencing "blackness" when he initiated the attack on Calabrese. However, as noted by the state court, trial counsel did not recall Petitioner ever telling him that he had no control over his actions and that counsel would have followed up on such a statement. (Doc. 38-9 at 36 n.20; Doc. 40-6 at 10.) It is also noteworthy that in interviews with the post-conviction experts Petitioner said the victim never regained consciousness. This change in narrative, in the face of his stipulated plea, his wife's testimony, and his statement to a reporter concerning the victim's consciousness, casts some doubt on the veracity of his newly-claimed lack of control. Regardless, Dr. Bayless testified that a cocaine-induced psychosis requires hallucinations and delusions and that in this case Petitioner was not delusional but knew exactly what he was doing as evidenced by Petitioner's logical and deliberate actions. In light of the competing experts' opinions and the evidentiary record, it was not objectively unreasonable for the state court to credit Dr. Bayless's testimony over that of Drs. Lanyon and French.

Petitioner also complains that the state court unreasonably determined that the testimony of Dr. Miller regarding Petitioner's difficult childhood was duplicative of that reported by mitigation specialist Davis because Dr. Miller's report examined the nature of the risk factors that Petitioner was exposed to as a child, "such as abuse, neglect, parental alcoholism, multiple marriages and divorces, and violent, aggressive behavior between adults

1   in the home." (Doc. 35 at 58.) He further asserts that Davis was unqualified to opine

2   whether Petitioner's "background contributed to psychological conditions or was a causal

3   factor in the commission of the offense." (*Id.*) However, Dr. Miller rendered no such

4   opinion, testifying only that the identified risk factors increase the probability a child will

5   someday engage in criminal activity. He expressly declined to offer an opinion about what

6   role Petitioner's risk factors may have played in the offense or to assess Petitioner's

7   psychological condition. (Doc. 40-1 at 11.) In addition, Dr. Miller's report is based in large

8   measure on Davis's mitigation report and her interview notes. It was not objectively

9   unreasonable for the state court to find that Dr. Miller's contributions were largely

10  duplicative of mitigation specialist Davis.

11          After careful review of the record, the Court concludes that it was not objectively

12  unreasonable for the PCR court to find no reasonable probability of a different outcome had

13  counsel presented expert testimony concerning cocaine intoxication and connecting

14  Petitioner's dysfunctional upbringing to his drug addiction and to the offense. The testimony

15  at the PCR hearing of Petitioner's siblings and Dr. Miller was largely duplicative and

16  cumulative of the information contained in the mitigation specialist's report. The sentencing

17  judge found, based on Davis's report, that Petitioner had established a difficult childhood as

18  a mitigating factor. Similarly, the sentencing judge found as a nonstatutory mitigating factor

19  that Petitioner was somewhat impaired by crack cocaine at the time of the offense. Petitioner

20  argues that expert testimony would have shown that he was in a cocaine-induced psychosis

21  and thus *substantially* impaired under A.R.S. § 13-703(G)(1), but the PCR court found

22  otherwise. This was not an unreasonable determination in light of the evidence of

23  Petitioner's planning, deliberate actions to conceal the crime, and his detailed memory of

24  what occurred. Specifically, it was not unreasonable to find that Petitioner had the ability

25  to appreciate the wrongfulness of his actions based on his discussing a plan to rob the victim

26  before she arrived at the house, moving the victim's truck, lying to her church about her

27  whereabouts and his home address, washing the stick used to bludgeon her head, and hiding

28  the body.

1

*Conclusion*

2      In determining that Petitioner's Sixth Amendment right to the effective assistance of

3  counsel was not violated by counsel's alleged deficiencies in investigating and presenting

4  mitigating evidence, the PCR court neither unreasonably applied *Strickland* nor unreasonably

5  determined the facts in light of the evidence developed in state court.  Because Petitioner is

6  precluded from relief by § 2254(d), the Court declines to permit discovery, expansion of the

7  record, and an evidentiary hearing on Claim 2.

8      **B.      Failure to Investigate and to Rebut Aggravation**

9      In Claim 3, Petitioner alleges that counsel was ineffective for failing to investigate

10 generally and failing to present evidence to rebut the cruelty prong of the (F)(6) aggravating

11 factor.  Specifically, he asserts counsel should have interviewed Petitioner's wife and

12 children, and hired an independent forensic pathologist to offer an opinion on whether the

13 victim was conscious at the time of the sexual assault and stabbing.

14      Respondents contend that Claim 3 was never fairly presented in state court and is now

15 procedurally defaulted.  Petitioner counters that the claim was raised in Claim Three of his

16 second amended PCR petition, which alleged that Petitioner's plea and sentencing were the

17 product of ineffective assistance of counsel because counsel failed to inform Petitioner of the

18 effects of his plea and sentencing stipulations.  (Doc. 38-10 at 27-28.)  Within the body of

19 this claim, counsel asserted that the defense had not interviewed Petitioner's children.  In

20 support, he appended declarations from Petitioner, asserting that counsel did not interview

21 the children, and his *Strickland* expert, asserting that counsel should not have permitted the

22 sentencing stipulation "without first having interviewed the children and explaining the

23 severe consequences of the stipulation."  (Doc. 43-10 at 13; Doc. 43-4 at 6.)

24      The Court finds that Claim 3 was not fairly presented in state court.  While the PCR

25 petition mentions an alleged failure to interview Petitioner's children, it does so in the

26 context of arguing counsel's ineffectiveness for failing to properly advise Petitioner of the

27 consequences of signing a stipulation summarizing the children's statements to police and

28 a counselor (which forms the basis of Claim 4 below), not as part of a claim asserting

1    ineffectiveness for failing to investigate and uncover evidence necessary to rebut the (F)(6)

2    aggravating factor.  Petitioner's PCR petition did not alert the state court to either the legal

3    theory or operative facts underlying Claim 3.  *See Wood v. Ryan*, 693 F.3d 1104, 1120 (9th

4    Cir. 2012) ("[A] general allegation of ineffective assistance of counsel is not sufficient to

5    alert a state court to separate specific instances of ineffective assistance."); *Moormann v.*

6    *Schriro*, 426 F.3d 1044, 1056 (9th Cir. 2005) (noting that a petitioner cannot add unrelated

7    alleged instances of ineffectiveness to any ineffectiveness claim raised in state court).

8    Because he has no available state court remedies, *see* Ariz. R. Crim. P. 32.2(b) and 32.1(d)-

9    (h), Claim 3 is procedurally barred absent a showing of cause and prejudice or fundamental

10   miscarriage of justice.  *Coleman*, 501 U.S. at 732, 735 n.1.

11        *Cause and Prejudice*

12        Petitioner argues that the ineffective assistance of PCR counsel constitutes cause for

13   the procedural default.  In states like Arizona, which require that ineffective-assistance-of-

14   trial-counsel claims be raised in an initial-review collateral proceeding, failure of counsel in

15   an initial-review collateral proceeding to raise a substantial trial ineffectiveness claim may

16   provide cause to excuse the procedural default of such a claim.  *Martinez v. Ryan*, 132 S. Ct.

17   1309, 1315 (2012).  To establish cause under *Martinez*, Petitioner must demonstrate that PCR

18   counsel was ineffective under the standards of *Strickland* for not raising a substantial

19   ineffective-assistance-of-trial-counsel claim.  This requires showing that the underlying

20   ineffectiveness claim is "rooted in 'a potentially legitimate claim of ineffective assistance of

21   trial counsel.'"  *Lopez v. Ryan*, 678 F.3d 1131, 1138 (9th Cir. 2012) (citing *Martinez*, 132 S.

22   Ct. at 1318).  "To have a legitimate IAC claim a petitioner must be able to establish both

23   deficient representation *and* prejudice."  *Id.*; *see also Leavitt v. Arave*, 682 F.3d 1138, 1140

24   (9th Cir. 2012); *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012).  Because the Court

25   concludes that Petitioner "fails to meet the *Martinez* test of substantiality as to prejudice,"

26

27

28

1    it does not address substantiality of the deficiency prong.[6]  *Lopez*, 678 F.3d at 1138; *see also*

2    *Leavitt*, 682 F.3d at 1140 (finding no substantial ineffectiveness claims where record

3    demonstrated no prejudice from alleged ineffectiveness).

4           Petitioner argues that his trial counsel was deficient for failing to interview

5    Petitioner's children, interview Petitioner's wife, and enlist a forensic pathologist to opine

6    about the unlikelihood the victim regained consciousness after being bludgeoned in the head.

7    He asserts this investigation would have led him to discover that the victim was not

8    conscious at the time of the rape or stabbing and, consequently, the sentencer would not have

9    found that the murder was committed in an especially cruel manner under A.R.S. § 13-

10   703(F)(6).

11          Petitioner does not specifically allege what would have been gained by counsel

12   interviewing his children.   With regard to his wife, Petitioner argues that on cross-

13   examination counsel could have demonstrated the unreliability of Kara Sansing's testimony

14   by eliciting the details of her statement to the police, which he describes as "unbelievable."

15   (Doc. 35 at 88.)   In support, he proffers a transcript of Kara's police interview, which

16   contains the following exchange:

17          INT:   Okay, you saw him having sex with her?

18          KS:    Yes.

19          INT:   Okay, were her pants down or just off or—?

20          KS:    Pants down to her knees.

21          INT:   Just down to her knees, okay.  What was she saying?

22          KS:    She asked him how it feels, and he says, well my wife's better.  And
                   hear what I'm saying, when I walked in when I heard her say that, and
23                 I just, looked at him Johnny, I says, you know, I can't believe you
                   would say that to her, I mean, I want to say, say something like well,
24                 how would you feel if I was doing it to a guy, and asking a guy, or guy
                   asking me, so what my husband's feels better, when you (inaudible)
25

26          ─────────────────────
               [6] Nonetheless, the Court notes that the state court record reflects that defense counsel
27   did, in fact, interview Petitioner's wife before the aggravation/mitigation hearing.  At the
     hearing, Kara Sansing acknowledged a previous interview with Ronan and testified to
28   statements she made at that time.  (RT 8/2/99 at 78-79.)

                                            - 54 -

making uncomfortable to hear you're wife's in another room and you're doing it with another woman and you're murdering her?

. . . .

INT:   Okay.  So he stabs her with this knife, uh, what does she do?

KS:    She would just say, please don't, please don't, just let me go, I won't call the cops.  I won't do nothing, and he's like yes you will, yes you will, as soon as you walk out of this house, you will call the cops.

(Doc. 53-2 at 14-15.)

Petitioner also points to declarations from Kara and Petitioner admitted during the state PCR hearing and proffers a newly-obtained report from a forensic pathologist. Petitioner's declaration states that he made false statements about the victim speaking during the sexual assault so as to minimize risk of a jail assault and that Calabrese was not in fact conscious when he returned from moving her truck.  (Doc. 43-10 at 11-12.)   In her declaration, Kara denies hearing the victim speak during the sexual assault and says the "only time she spoke was when she was being tied up in the kitchen area." (*Id.* at 5.)  The forensic pathologist opines that if the victim did regain consciousness, it likely would have been for no more than five to ten minutes, during which her perception of pain and her ability to speak cognitively likely would have been impaired given the brain damage she had sustained. (Doc. 53-2 at 25.)

To establish prejudice from counsel's alleged deficiencies, Petitioner must show a reasonable probability of a different outcome.  For several reasons, there is no reasonable probability the sentencer would not have found the (F)(6) "especially heinous, cruel or depraved" aggravating factor.  First, the new evidence Petitioner alleges counsel could have presented is not significant.  The new pathologist's report is not appreciably different from the testimony of the medical examiner, who opined it was possible but doubtful the victim regained consciousness.  In addition, Petitioner's and Kara's post-conviction declarations lack credibility in light of their self-serving nature and Petitioner's previous admissions to the court and a newspaper reporter.

Second, even if Petitioner's new evidence raised a reasonable doubt as to whether the

victim regained consciousness, he cannot show prejudice because the sentencing judge found beyond a reasonable doubt that the murder was committed in an especially heinous or depraved manner.  This finding alone, separate from cruelty, was sufficient to establish the (F)(6) factor.  *Sansing I*, 200 Ariz. at 356, 26 P.3d at 1127 ("Because the statute is written in the disjunctive, the sentencing judge need find only one of the factors to establish an F.6 aggravating factor."); *see also Sansing II*, 206 Ariz. at 237-38, 77 P.3d at 35-36 (concluding that no reasonable jury would have failed to find that Calabrese's murder was especially heinous).

Third, in finding cruelty, the sentencing judge did not rely solely on the victim's physical pain and mental suffering during the rape and stabbing.  The court found that Calabrese consciously experienced physical pain during the initial attack, as indicated by the ligature wounds and bruises on her wrists and ankles, the defensive wounds to her hands, the trauma to her face, and the "two deep blows to the back of her head, which caused bruising of the brain and hemorrhaging."  (RT 9/30/99 at 13.)  It further found that Calabrese suffered mental anguish, as demonstrated by her praying to God and pleading with Petitioner's children to summon help.  There is no dispute that the victim was conscious throughout the initial attack when she struggled against being tied up.  Likewise, the Arizona Supreme Court also found during its independent review that the cruelty prong had been established based on the mental suffering that occurred between the beginning of the attack and the victim's loss of consciousness.  *Sansing I*, 200 Ariz. at 358, 26 P.3d at 1128 ("The evidence shows beyond a reasonable doubt that the victim was aware and had sufficient time to contemplate her fate.")  Moreover, in reviewing the *Ring* violation for harmless error, the Arizona Supreme Court expressly stated that cruelty had been established in three independent ways, one being mental anguish during the initial attack.  *Sansing II*, 206 Ariz. at 235-36, 77 P.3d at 33-34.

Because Petitioner has not alleged facts that, even if true, support a finding of prejudice from counsel's failure to investigate and present evidence to rebut the (F)(6) factor, the Court finds that it is not a substantial ineffectiveness claim.  Therefore, PCR counsel's

1    failure to raise Claim 3 in the PCR petition was not ineffective and does not provide cause
2    for its procedural default.

3    *Miscarriage of Justice*

4    Petitioner contends that a fundamental miscarriage of justice will occur if Claim 3 is
5    not heard on the merits because he is actually innocent of the death penalty.  To satisfy this
6    exception to procedural default, Petitioner must show by clear and convincing evidence that,
7    but for constitutional error, no reasonable factfinder would have found the existence of *any*
8    aggravating circumstance or some other condition of eligibility for the death sentence under
9    the applicable state law.  *Sawyer*, 505 U.S. at 335-36.

10   Petitioner argues that the (F)(6) aggravating factor would not have been established,
11   and thus Petitioner would not be eligible for the death penalty, if counsel had conducted a
12   proper investigation and rebutted the finding of consciousness.  However, as already
13   explained, the state court's (F)(6) finding rested on both the cruelty and "heinous or
14   depraved" prongs, either of which rendered Petitioner eligible for the death penalty.
15   Accordingly, Petitioner has not established by clear and convincing evidence that he is
16   actually innocent of the death penalty.

17   *Evidentiary Development*

18   Because Claim 3 is procedurally barred, Petitioner's requests for discovery, expansion
19   of the record, and an evidentiary hearing are denied.

20   **C.    Failure to Properly Advise**

21   In Claim 4, Petitioner alleges that had counsel properly advised him about the
22   consequences of his plea's stipulated factual basis and the sentencing stipulation, he would
23   not have signed these documents and the admissions contained therein would not have been
24   used by the prosecution to establish the cruelty prong of the (F)(6) aggravating factor.
25   Respondents acknowledge that Claim 4 was raised in Petitioner's PCR petition, but argue it
26   is procedurally defaulted because in his petition for review to the Arizona Supreme Court
27   Petitioner merely incorporated the arguments and authorities set forth in his PCR petition,
28   which he appended to his petition for review in lieu of restating the argument in the body of

1    the petition.  However, the Ninth Circuit has held that this is sufficient to fairly present a

2    claim to an appellate court.  *See Scott v. Schriro*, 567 F.3d 573, 582-83 (9th Cir. 2009).

3         The state PCR court denied relief on Claim 4 without explanation, stating that the

4    claim failed to present "a material issue of fact or law."  (Doc. 38-9 at 29.)  The Arizona

5    Supreme Court summarily denied review.  "Where a state court's decision is unaccompanied

6    by an explanation, the habeas petitioner's burden still must be met by showing there was no

7    reasonable basis for the state court to deny relief."  *Richter*, 131 S. Ct. at 784.  In addition,

8    this Court must apply the "doubly deferential" standard of review under *Strickland* and

9    § 2254(d).  *Id.* at 788.  Doing so, and in light of the record that was before the state court, the

10   Court finds that the state court's denial was not objectively unreasonable because

11   "fairminded jurists could disagree" on whether counsel's performance was deficient or

12   Petitioner suffered prejudice.  *Richter*, 131 S. Ct. at 786.

13        First, Petitioner stated during his change-of-plea hearing that he reviewed the factual

14   basis with counsel.  Although Petitioner now asserts in his declaration that counsel did not

15   advise him of all the potential sentencing consequences from his admissions, it would not be

16   unreasonable to discount this evidence, especially in the absence (as here) of any evidence

17   relating to counsel's recollections of their pre-plea discussions and in light of Petitioner's

18   own admission in his declaration that he is not a truthful person.  Second, the record suggests

19   that Petitioner did not want his children to be called as witnesses and therefore agreed to the

20   sentencing stipulation to minimize their involvement in the proceedings.  Third, even if

21   Petitioner had refused to sign the factual basis or agreed to the sentencing stipulation, there

22   is no reasonable probability of a different outcome.

23        Kara Sansing testified at sentencing that she heard the victim speak during the sexual

24   assault.  Had the parties not agreed to the sentencing stipulation, the prosecution likely would

25   have called as witnesses the reporter to whom Petitioner admitted that the victim had

26   regained consciousness, as well as Petitioner's children.  Moreover, as just discussed with

27   respect to Claim 3, the sentencing court determined that the (F)(6) factor was established

28   both because the crime was committed in a heinous and depraved manner and because it was

1   especially cruel.  Either one of these prongs was sufficient to sustain the factor.  In addition,
2   the court found cruelty based on the mental anguish and physical pain suffered by the victim
3   prior to losing consciousness.

4         **D.**     **Cumulative Prejudice**

5         In Claim 5, Petitioner contends that trial counsel's errors resulted in cumulative
6   prejudice.  Respondents assert that this claim was never presented in state court.  Regardless,
7   because Petitioner has not established any constitutional deficiencies in counsel's
8   representation, his claim of cumulative prejudice fails.

9   **IV.**     **SENTENCING ERRORS**

10        **A.**     **Causal Nexus**

11        In Claim 7, Petitioner alleges that his right to an individualized sentencing
12  determination was violated when the trial court and the Arizona Supreme Court employed
13  a causal nexus test to avoid giving effect to his mitigating evidence.  Citing *Tennard v.*
14  *Dretke*, 542 U.S. 274, 289 (2004), Petitioner asserts that the trial court improperly refused
15  to give weight to his difficult childhood, dysfunctional family background, and family
16  support, and that the Arizona Supreme Court similarly refused to give any weight to his
17  alleged drug impairment, background, and lack of education when it reviewed the *Ring*
18  violation for harmless error.  Respondents assert that Petitioner did not properly exhaust all
19  aspects of this claim.  However, because the claim lacks merit, the Court declines to reach
20  the exhaustion issue.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas
21  corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust
22  the remedies available in the courts of the State."); *Rhines v. Weber*, 544 U.S. 269, 277
23  (2005) (noting that a district could would abuse its discretion if it were to grant a stay so that
24  a petitioner could attempt to exhaust "plainly meritless" claims).

25        <u>Relevant Facts</u>

26        On direct appeal, Petitioner argued that the trial court violated his constitutional rights
27  by refusing to consider his difficult childhood and dysfunctional family background absent
28  a causal link to the offense.  (Doc. 37-2 at 50-56.)  The Arizona Supreme Court addressed

this claim as follows:

>    The defendant proffered his difficult childhood and family background as non-statutory mitigating circumstances. At sentencing, the judge held that the defendant had established by a preponderance of the evidence that he had a difficult childhood and family background but declined to give the evidence "significant mitigating weight" because "there [was] nothing in the defendant's childhood or family background that provides a causal link to the horrific crime committed." The defendant argues the judge's refusal to give the evidence significant weight due to a lack of a causal nexus violates his due process and Eighth Amendment rights under *Penry v. Lynaugh,* 492 U.S. 302, 109 S. Ct. 2934 (1989); *Eddings v. Oklahoma,* 455 U.S. 104, 102 S. Ct. 869 (1982); and *Lockett v. Ohio,* 438 U.S. 586, 98 S. Ct. 2954 (1978).

>    We have previously considered and rejected this argument. We have interpreted *Penry, Eddings,* and *Lockett* as directing the sentencing judge to "consider evidence proffered for mitigation." *State v. Djerf,* 191 Ariz. 583, 598 ¶ 61, 959 P.2d 1274, 1289 ¶ 61 (1998) (with respect to mitigating evidence, the sentencing judge is "entitled to give it the weight it deserves"); *see also State v. Towery,* 186 Ariz. 168, 189, 920 P.2d 290, 311 (1996) ("The sentencer therefore must consider the defendant's upbringing if proffered but is not required to give it significant mitigating weight."). However, "[h]ow much weight should be given proffered mitigating factors is a matter within the sound discretion of the sentencing judge." *Towery,* 186 Ariz. at 189, 920 P.2d at 311.

>    "Arizona law states that a difficult family background is not relevant unless the defendant can establish that his family experience is linked to his criminal behavior." *Djerf,* 191 Ariz. at 598 ¶ 61, 959 P.2d at 1289 ¶ 61; *see also State v. Hoskins,* 199 Ariz. 127, 151 ¶ 110, 14 P.3d 997, 1021 ¶ 110 (2000) (Family dysfunction "can be mitigating only when actual causation is demonstrated between early abuses suffered and the defendant's subsequent acts."); *Towery,* 186 Ariz. at 189, 920 P.2d at 311 ("family background may be a substantial mitigating circumstance when it is shown to have some connection with the defendant's offense-related conduct"); *State v. Wallace,* 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989) ("A difficult family background is a relevant mitigating circumstance if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control."). No testimony suggested that the defendant's childhood affected his behavior on the day of the murder. The evidence on this subject did not "prove a loss of impulse control or explain what caused him to kill." *Towery,* 186 Ariz. at 189, 920 P.2d at 311. The sentencing judge properly considered the defendant's difficult childhood as a non-statutory mitigating circumstance and gave the evidence appropriate weight.

*Sansing I*, 200 Ariz. at 358-59, 26 P.3d at 1129-30.

As discussed above, in reviewing for harmless error following *Ring*, the Arizona Supreme Court, assessed the evidence and agreed with the trial court that the (G)(1) factor was not proved and that the non-statutory mitigating evidence was entitled to little weight. *Sansing II*, 206 Ariz. at 238-41, 77 P.3d at 36-39. In making these determinations the court

1   noted that Petitioner "failed entirely to show any causal nexus between his alleged drug use

2   and impairment." *Id.* at 239, 77 P.3d at 37.  This, combined with Petitioner's failure to

3   quantify how much crack he had used along with evidence of planning and taking steps to

4   avoid detection, led the court to conclude that Petitioner had failed to prove the existence of

5   the (G)(1) substantial impairment factor.  When the court later discussed impairment as a

6   non-statutory mitigating circumstance, it found based on its previous discussion of (G)(1)

7   that "no reasonable jury could have accorded the impairment claim more than minimal

8   weight." *Id.* at 240-41, 77 P.3d at 38-39.  The court also noted that Petitioner had failed to

9   "demonstrate any causal link between his crimes and his childhood and lack of education."

10  *Id.* at 241, 77 P.3d at 39.   Therefore, "a reasonable jury could have accorded these two

11  factors only minimal weight." *Id.*  Petitioner sought rehearing, arguing *inter alia* that a

12  causal nexus is not required to establish mitigation. (Doc. 38-3 at 54.)  The Arizona Supreme

13  Court, evenly divided on a 2-2 vote, summarily denied the motion.  (Doc. 38-4 at 2.)

14          <u>Analysis</u>

15          Once a determination is made that a person is eligible for the death penalty, the

16  sentencer must consider relevant mitigating evidence, allowing for "an individualized

17  determination on the basis of the character of the individual and the circumstances of the

18  crime." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).  The Supreme Court has explained

19  that "evidence about the defendant's background and character is relevant because of the

20  belief, long held by this society, that defendants who commit criminal acts that are

21  attributable to a disadvantaged background may be less culpable than defendants who have

22  no such excuse." *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (quoting *Penry v. Lynaugh*,

23  492 U.S. 302, 319 (1989)).  Therefore, the sentencer in a capital case is required to consider

24  any mitigating information offered by a defendant, including non-statutory mitigation.  *See*

25  *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (right to individualized sentencing in capital cases

26  violated by Ohio statute that permitted consideration of only three mitigating factors);

27  *Eddings v. Oklahoma*, 455 U.S. 104, 113-15 (1982) (*Lockett* violated where state courts

28  refused as a matter of law to consider mitigating evidence that did not excuse the crime).

1    In *Lockett* and *Eddings*, the Court held that under the Eighth and Fourteenth

2    Amendments the sentencer must be allowed to consider, and may not refuse to consider, "any

3    aspect of a defendant's character or record and any of the circumstances of the offense that

4    the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

5    However, while the sentencer must not be foreclosed from considering relevant mitigation,

6    "it is free to assess how much weight to assign such evidence." *Ortiz v. Stewart*, 149 F.3d

7    923, 943 (9th Cir. 1998). As the *Eddings* court explained: "The sentencer . . . may determine

8    the weight to be given relevant mitigating evidence. But they may not give it no weight by

9    excluding such evidence from their consideration." 455 U.S. at 114-15.

10    In *Tennard v. Dretke*, the Court reiterated the general principle that it is not enough

11    simply to allow a defendant to present mitigating evidence, the sentencer must be able to

12    consider and give effect to that evidence. 542 U.S. 274, 283 (2004). In that case, involving

13    a prisoner's low IQ, the Court invalidated a "screening test" applied by the Fifth Circuit that

14    required the defendant to prove a "nexus" between mitigating evidence and the offense in

15    order for the evidence to be considered by the sentencer.

16    In *Schad v. Ryan*, the Ninth Circuit observed that prior to *Tennard* Arizona courts

17    recognized a nexus test to preclude consideration of evidence of childhood abuse unless the

18    abuse bore a casual connection to the offense. 671 F.3d 708, 723 (9th Cir. 2011), *cert.*

19    *denied*, 133 S. Ct. 432 (2012). "After *Tennard*, however, the Arizona Supreme Court has

20    clarified that the nexus test affects only the weight of mitigating evidence, not its

21    admissibility." *Id.* (citing *State v. Newell*, 212 Ariz. 389, 405, 132 P.3d 833, 849 (2006)).

22    The *Schad* court further observed that the "United States Supreme Court has said that the use

23    of the nexus test in this manner is not unconstitutional because state courts are free to assess

24    the weight to be given to particular mitigating evidence." 671 F.3d at 723. Indeed, the

25    Supreme Court has held that there is no constitutional requirement of unfettered discretion

26    in the sentencer, noting that "States are free to structure and shape consideration of mitigating

27    evidence 'in an effort to achieve a more rational and equitable administration of the death

28    penalty.'" *Boyde v. California*, 494 U.S. 370, 377 (1990) (quoting *Franklin v. Lynaugh*, 487

U.S. 164, 181 (1988) (plurality opinion)).  It has further explained that "*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." *Johnson v. Texas*, 509 U.S.350, 361-62 (1993) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 456 (1990) (Kennedy, J., concurring in judgment)).  Thus, "[a]lthough *Lockett* and *Eddings* prevent a State from placing relevant mitigating evidence 'beyond the effective reach of the sentencer,' *Graham v. Collins*, [506 U.S. 461, 475 (1993)], those cases and others in that decisional line do not bar a State from guiding the sentencer's consideration of mitigating evidence." *Id.* at 362; *see Saffle v. Parks*, 494 U.S. 484, 492-93 (1990) (holding that an instruction directing the jury to avoid any influence of sympathy when imposing sentence did not violate *Lockett* and *Eddings* and noting the "distinction between allowing the jury to consider mitigating evidence and guiding their consideration").

Applying these principles, it is apparent in Petitioner's case that the trial court fulfilled its constitutional obligation by allowing and considering all of the mitigating evidence, and that the Arizona Supreme Court's decision rejecting Petitioner's arguments to the contrary was neither contrary to, nor based on an unreasonable application of, Supreme Court law. The record supports the conclusion that the state courts gave Petitioner's drug impairment, difficult childhood, lack of education, and family support "little or no weight as a matter of *fact*, after giving individualized consideration to the evidence, rather than treating the evidence as irrelevant or nonmitigating as a matter of law." *Towery v. Ryan*, 673 F.3d 933, 946 (9th Cir.), *cert. denied*, 132 S. Ct. 1738 (2012); *see also Lopez v. Ryan*, 630 F.3d 1198, 1203 (9th Cir.), *cert. denied*, 132 S. Ct. 577 (2011) (reviewing record to determine whether state court applied impermissible casual nexus requirement).  The trial court thoroughly discussed the mitigating circumstances presented at sentencing and did not exclude or refuse to consider any mitigating evidence.  The court did not state that the lack of a causal connection foreclosed consideration of the evidence or that such evidence could not "constitute" mitigation.  Rather, it chose to not to give "significant mitigating weight to the

1    defendant's childhood and family background." (RT 9/30/99 at 21.) Similarly, the court

2    found family love and support to be a non-statutory mitigating circumstance, but gave it

3    "only minimal weight because it did not prevent the defendant from committing" the offense

4    or victimizing his children. (*Id.* at 22.)

5         On appeal, the Arizona Supreme Court correctly recognized that the sentencing court

6    was required to "consider evidence proffered for mitigation" but further noted that the

7    amount of weight that should be given to such evidence "is a matter within the sound

8    discretion of the sentencing judge." *Sansing I*, 200 Ariz. at 358, 26 P.3d at 1129. It

9    concluded that the "sentencing judge properly considered the defendant's difficult childhood

10   as a non-statutory mitigating circumstance and gave the evidence appropriate weight." *Id.*

11   at 359, 26 P.3d at 1130. This was not contrary to Supreme Court precedent. *See Lopez*, 673

12   F.3d at 944-45.

13        In conducting its own independent review of Petitioner's sentence, the supreme court

14   disagreed with the trial court's finding of pecuniary gain as an aggravating factor but

15   nonetheless concluded that the mitigation failed to outweigh the especially cruel aggravating

16   factor because of the "minimal value of the mitigating evidence." *Sansing II*, 200 Ariz. at

17   360, 26 P.3d at 1132. In doing so, the court again noted that the trial judge "gave the

18   defendant's difficult family background *little mitigating weight* because the defendant failed

19   to establish the required causal link." *Id.* (emphasis added). Furthermore, in carrying out its

20   harmless error review of Petitioner's sentence, the Arizona Supreme Court considered and

21   evaluated all of the proffered mitigating circumstances to determine whether a jury would

22   have reached a different sentencing decision than the trial judge. The court cited the lack of

23   a nexus between the mitigating circumstances and the crime simply as one of the criteria by

24   which a jury would have *weighed* the mitigating information. *Sansing II*, 206 Ariz. at 240-

25   41, 77 P.3d at 38-39.

26        It is evident from the record that both the trial court and the Arizona Supreme Court

27   considered all of Petitioner's proffered mitigation. The fact that some of the proven

28   circumstances were not accorded significant weight does not amount to a constitutional

1   violation under *Lockett* and *Eddings*. *Towery*, 673 F.3d at 945; *Schad*, 671 F.3d at 724;

2   *Lopez*, 630 F.3d at 1204; *see also Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992)

3   ("Although Atkins argues that the trial judge did not *consider* non-statutory factors, it is more

4   correct to say that the trial judge did not *accept*—that is, give much weight to—Atkins' non-

5   statutory factors.   Acceptance of non-statutory mitigating factors is not constitutionally

6   required; the Constitution only requires that the sentencer *consider* the factors."); *State v.*

7   *Mata*, 185 Ariz. 319, 331 n.6, 916 P.2d 1035, 1047 (1996) ("Defendant seems to believe that

8   a trial court only 'considers' mitigating evidence if it imposes a mitigated sentence.   The law

9   is to the contrary.   So long as the trial court considers the evidence, the judge is not bound

10   to conclude that the evidence calls for leniency.").

11          **B.    (F)(6) Finding**

12          In Claim 9, Petitioner contends that the trial court erred in finding the especially

13   heinous, cruel, or depraved aggravating factor under A.R.S. § 13-703(F)(6), in violation of

14   his rights under the Fifth, Eighth, and Fourteenth Amendments.   Respondents contend that

15   the Fifth and Fourteenth Amendment aspects of this claim are procedurally barred because

16   Petitioner did not cite these provisions when raising the claim on direct appeal.   Regardless,

17   the Court will address the entirety of the claim because it is plainly meritless.   *See* 28

18   U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. at 277.

19          Whether a state court correctly applied an aggravating factor to the facts is a question

20   of state law.   *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).   Federal habeas review is

21   limited to determining whether the state court's finding was so arbitrary or capricious as to

22   constitute an independent due process or Eighth Amendment violation.   *Id*.   A state court's

23   finding of an aggravating factor is arbitrary or capricious only if no reasonable sentencer

24   could have reached the same conclusion.   *Id*. at 783.   In reviewing the sufficiency of the

25   evidence under this "rational factfinder" standard, the question is "whether after viewing the

26   evidence in the light most favorable to the prosecution, any rational trier of fact" could have

27   made the finding beyond a reasonable doubt.   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

28   A habeas court faced with a record of historical facts which supports conflicting inferences

1    must presume (even if it does not appear in the record) that the trier of fact resolved any such

2    conflicts in favor of the prosecution. *Id.* at 326.

3        Arizona's (F)(6) aggravating factor, phrased in the disjunctive, is satisfied if the

4    murder is either especially heinous, or cruel, or depraved. *State v. Murray*, 184 Ariz. 9, 37,

5    906 P.2d 542, 570 (1995). The especially cruel prong is satisfied "if the victim consciously

6    experienced physical or mental pain and suffering prior to dying." *State v. Lopez*, 174 Ariz.

7    131, 143, 847 P.2d 1078, 1090 (1992). Evidence about "[a] victim's certainty or uncertainty

8    as to his or her ultimate fate can be indicative of cruelty and heinousness." *State v. Gillies*,

9    142 Ariz. 564, 569, 691 P.2d 655, 660 (1984); *see also State v. Kemp*, 185 Ariz. 52, 65, 912

10   P.2d 1281, 1294 (1996). Heinousness and depravity focus the defendant's state of mind.

11   *State v. Ceja*, 126 Ariz. 35, 39, 612 P.2d 491, 495 (1980). Factors supporting a finding that

12   a murder was heinous and depraved include the infliction of gratuitous violence and

13   helplessness of the victim. *See Gretzler*, 135 Ariz. at 52, 659 P.2d at 11.

14       As set forth above, the trial court found that the State had proven both cruelty and

15   heinousness/depravity beyond a reasonable doubt. On direct appeal, the Arizona Supreme

16   Court concurred with the trial court's cruelty findings and rejected Petitioner's argument that

17   the victim had not been conscious long enough to suffer within the meaning of (F)(6).

18   *Sansing I*, 200 Ariz. at 357, 26 P.3d at 1128. The court also rejected Petitioner's argument

19   that the time frame between the beginning of the attack and the victim's initial loss of

20   consciousness was too short to support a finding of cruelty. *Id.* Because it concurred in the

21   trial court's cruelty findings, the supreme court declined to address the question of

22   heinousness or depravity. *Id.* However, it did address this aspect of the (F)(6) finding when

23   it reviewed the *Ring* violation for harmless error, finding that the rape, facial wounds, neck

24   ligatures, gagging, blindfolding, and grinding of the knife in the victim's abdomen all

25   constituted violence beyond that necessary to kill. *Sansing II*, 206 Ariz. at 238, 77 P.3d at

26   36.

27       Petitioner argues that the facts do not support a conclusion that the victim regained

28   consciousness after being hit in the head. Similar to his arguments in Claim 1, Petitioner

1    argues that Kara Sansing's statements to police are unreliable and that Petitioner did not

2    knowingly, intelligently, and voluntarily make the admissions contained within the factual

3    basis of his plea.  He further argues that a finding of cruelty could not be based on the limited

4    time the victim was known to be conscious before the first blow to her head, asserting that

5    under Arizona law the suffering had to have occurred at the time of death.

6          To the extent Petitioner relies on new evidence regarding the victim's consciousness,

7    the Court does not consider it because a sufficiency-of-the-evidence claim is necessarily

8    limited to the state court record.  *See Jackson*, 443 U.S. at 322 (this type of claim almost

9    never necessitates an evidentiary hearing); *Bashor v. Risley*, 730 F.2d 1228, 1233 (9th Cir.

10   1984) ("Whether the evidence was sufficient . . . must be determined from a review of the

11   evidence in the record in the *state* proceedings.").

12         Viewed in the light most favorable to the State, there was sufficient evidence to

13   establish cruelty.  Based upon the evidence admitted at the sentencing hearing, a rational

14   factfinder could have determined from the numerous injuries sustained during the initial

15   struggle and from her pleas for help that the victim suffered mental anguish and uncertainty

16   as to her fate when she was attacked, pinned to the floor, and bound at her hands and wrists.

17   Moreover, given the uncontradicted testimony of Kara Sansing and Petitioner's admissions

18   that the victim regained consciousness, a rational factfinder could have determined that the

19   victim suffered both mentally and physically when she was sexually assaulted and repeatedly

20   stabbed.  The Arizona Supreme Court's decision upholding the cruelty finding was not

21   objectively unreasonable.  *See Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (applying deference

22   required by § 2254(d) to already deferential review of state court's resolution of sufficiency-

23   of-evidence claim).

24         Petitioner also challenges the trial court's finding that the murder was committed in

25   an especially heinous or depraved manner, arguing there was insufficient evidence that

26   gratuitous violence was inflicted.  However, a rational trier of fact could have found

27   gratuitous violence based on the numerous injuries to the victim beyond the stab wounds.

28   The Arizona Supreme Court's decision upholding this aspect of the (F)(6) factor was not

1  objectively unreasonable.

2  **C.    (G)(1) Finding**

3      In Claim 10, Petitioner alleges that the trial court erred in not finding as mitigation

4  that his ability to appreciate the wrongfulness of his conduct or to conform his conduct to the

5  law was significantly impaired under A.R.S. § 13-703(G)(1), in violation of his rights under

6  the Eighth and Fourteenth Amendments.  (Doc. 35 at 117.)  However, in his reply, Petitioner

7  asserts that this claim is based on the mitigating weight accorded by the state court to the

8  evidence of his impaired capacity.  (Doc. 51 at 55.)  Regardless of how the claim is

9  characterized, it is plainly meritless.

10      The Supreme Court has reiterated that its "precedents confer upon defendants the right

11  to present sentencers with information relevant to the sentencing decision and oblige

12  sentencers to consider that information in determining the appropriate sentence," but that the

13  "thrust of our mitigation jurisprudence ends here." *Kansas v. Marsh*, 548 U.S. 163, 175

14  (2006).  "Once mitigating evidence is allowed in, a finding that there are "no mitigating

15  circumstances" does not violate the Constitution." *Williams v. Stewart*, 441 F.3d 1030, 1057

16  (9th Cir. 2006).

17      Applying the rule of *Lockett* and its progeny to the case at bar, it is clear that the

18  sentencing court complied with its federal constitutional duties by considering in a thorough

19  manner Petitioner's impairment-related mitigating evidence. *Eddings*, 455 U.S. at 113.  The

20  court specifically stated that it gave some mitigating weight to Petitioner's claim that he was

21  impaired by crack cocaine at the time of the crime.  That the court found the evidence

22  insufficient to establish significant impairment under (G)(1) is not problematic in light of the

23  settled principle that a sentencer is not required to find proffered evidence mitigating, nor

24  must it accord the evidence the weight which a defendant believes is appropriate. *Harris v.*

25  *Alabama*, 513 U.S. 504, 512 (1995).

26  **D.    Victim's Character**

27      In Claim 11, Petitioner asserts that the trial court improperly considered the victim's

28  good character in imposing the death penalty, in violation of his rights under the Eighth and

Fourteenth Amendments.  The Arizona Supreme Court addressed this claim on direct appeal:

> The defendant asserts that the judge improperly based his sentencing decision on Ms. Calabrese's good character.  In his special verdict, the judge referred to the victim as a "Good Samaritan" and as a person who "took great joy in helping people in need."  The judge's concluding remarks, after considering all aggravating and mitigating factors, described Ms. Calabrese as a person who "stood out like a shining light, as a true Samaritan" and who "kept her faith in God to the end."  The defendant argues that the judge imposed the death sentence because he viewed the victim as a person above the norm of other murder victims.  That approach, he argues, violates A.R.S. section 13-703, which does not define the character of the victim as an aggravating factor, and discriminates on the basis of the victim's status.  A.R.S. § 13-703.A H (2001).

> We agree with the State that the judge's comments, taken in context, do not show that the trial judge relied upon the victim's good character in imposing the sentence.  Taken in context, the comments merely state the judge's summary of the aggravating factors, particularly the senselessness of the crime and the helplessness of the victim.  The fact that the victim was delivering food when attacked is related to the senselessness of the crime; the judge's comments related to "resorting to prayer for comfort" describe the helplessness of the victim after she had been beaten and bound.

> The defendant relies on *Gerlaugh v. Lewis,* 898 F.Supp. 1388 (D.Ariz.1995), *aff'd* 129 F.3d 1027 (9th Cir.1997), to support his argument that imposing a death sentence based on the social or economic background of the victim or defendant supports a claim of discrimination.  In *Gerlaugh,* the habeas petitioner alleged that Arizona's death sentence is "discriminately applied because the death penalty is more likely to be imposed if the victim is white and the defendant is a young male from a lower socio-economic background."  *Gerlaugh,* 898 F.Supp. at 1416.  The court stated that "[t]o prevail on an equal protection claim, Petitioner must prove 'that the decision-makers in *his* case acted with discriminatory purpose.'" *Id.* (citing *McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S. Ct. 1756 (1987)).  The defendant points to no facts that support a finding that the trial judge acted with discriminatory purpose, and nothing in the special verdict suggests that the victim's social or economic background affected the judge's decision.

*Sansing I*, 200 Ariz. at 352-53, 26 P.3d at 1123-24.

Petitioner asserts summarily that the state court's ruling was both contrary to and an unreasonable application of clearly established federal law, and was based on an unreasonable determination of the facts.  He argues that the trial court's reliance on the victim's character "so infected the sentence hearing with unfairness as to make the resulting death sentence a denial of due process."  (Doc. 35 at 121; internal quote and alteration marks omitted.)  He further asserts that the trial court's consideration of the victim's character and status in the community resulted in the death penalty being imposed in a discriminatory

manner.

The Arizona Supreme Court's resolution of this claim was neither objectively unreasonable nor contrary to controlling Supreme Court law. The supreme court reasonably concluded based on the record that the trial court's comments regarding the victim's good character reflected the judge's determination that the murder was committed in an especially heinous, cruel, or depraved manner under A.R.S. § 13-703(F)(6) because the victim was helpless and the crime was senseless. The fact that the victim went to Petitioner's home to deliver food from her church underscored both of these factors—she simply had no reason to suspect Petitioner would attack, rob, and rape her. Additionally, the state supreme court reasonably concluded that Petitioner had failed to demonstrate purposeful discriminatory intent.

### E.    Request for Leniency

In Claim 12, Petitioner contends that his rights under the Eighth and Fourteenth Amendments were violated when the trial court failed to find and consider as mitigation the victim's daughter's request that Petitioner not be sentenced to death. The Arizona Supreme Court addressed this claim on direct appeal:

> At sentencing, the judge considered and rejected the request of the victim's ten-year-old daughter for mercy as a mitigating circumstance. The defendant asserts the judge thereby violated the rights of a victim to be heard, as guaranteed by Article 2, Section 2.1.(A)4 of the Arizona Constitution, A.R.S. section 13-4426.A, and Arizona Rule of Criminal Procedure 39.b.7. The State responds that a victim's rights are satisfied when the court gives the victim a chance to speak, orally or in writing, at sentencing. *See Gulbrandson,* 184 Ariz. at 66, 906 P.2d at 599 ("The Victims' Bill of Rights of the Arizona Constitution, however, guarantees victims of crime the right '[t]o be heard at ... sentencing.' [Citation omitted.] Here, the victim's family made statements at the sentencing hearing and in letters and statements attached to the presentence report.").

> In *State v. Trostle,* we rejected the defendant's argument. There, the defendant "claim[ed] that the judge should have considered requests from the victim's family that he be sentenced to life imprisonment [rather than death]." 191 Ariz. 4, 22, 951 P.2d 869, 887 (1997). We disagreed, stating "such evidence is irrelevant to either the defendant's character or the circumstances of the crime and is therefore not proper mitigation." *Id.* (citing *State v. Williams,* 183 Ariz. 368, 385, 904 P.2d 437, 454 (1995)). Moreover, A.R.S. section 13-703.D expressly forbids the consideration of "any recommendation made by the victim regarding the sentence to be imposed."

In this case, the victim's rights were satisfied by the presence of Mr. Calabrese at the sentencing hearing and the court's acceptance of documents submitted by the victim's daughter. The judge correctly refused to consider the daughter's sentencing recommendation when imposing the sentence.

*Sansing I*, 200 Ariz. at 358, 26 P.3d at 1129.

In reviewing the *Ring* error for harmless error, the Arizona Supreme Court ruled that no reasonable jury could have accorded mitigating weight to the request for leniency because a "victim's sentencing request is not proper mitigation evidence." *Sansing II*, 206 Ariz. at 241, 77 P.3d at 39. The court cited its earlier decision in *Lynn v. Reinstein*, 205 Ariz. 186, 68 P.3d 412, (2003), in which a murder victim's husband asserted a right under Arizona's Victims' Bill of Rights to recommend life imprisonment over the death penalty during the sentencing phase of a defendant's trial. Citing *Booth v. Maryland*, 482 U.S. 496, 509 (1987), and *Payne v. Tennessee*, 501 U.S. 808, 825, 827 (1991), the court in *Lynn* held that the Eighth Amendment prohibits victims' recommendations regarding the appropriate sentence for a capital defendant. 205 Ariz. at 191, 68 P.3d at 417. It further held that [v]ictims' recommendations to the jury regarding the appropriate sentence a capital defendant should receive are not constitutionally relevant to the harm caused by the defendant's criminal acts or to the defendant's blameworthiness or culpability." *Id.*

Petitioner argues that the state court's ruling was contrary to, and based on an unreasonable application of, *Lockett*, *Eddings*, and *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), because the recommendation of a life sentence from the victim's daughter was relevant mitigating evidence. He further asserts, citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), that this error had a substantial and injurious effect on his sentence.

In *Skipper*, the Court restated the well-settled rule of *Eddings* that a sentencer must consider as a mitigating factor "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 476 U.S. at 4. "Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Id.* (citing *Eddings*, 455 U.S. at 114).

1    Petitioner here argues that a victim's favorable sentencing recommendation is relevant

2    because it has mitigating value and could be found by a sentencer to warrant a sentence less

3    than death.  The Arizona Supreme Court determined that such evidence is not relevant as

4    mitigation.  The United States Supreme Court has not addressed the issue or ever held that

5    a victim's recommendation of leniency constitutes relevant mitigation.  Thus, Petitioner

6    cannot show that the Arizona Supreme Court's decision was contrary to or based on an

7    unreasonable application of "clearly established Federal law," as determined by the Supreme

8    Court.  28 U.S.C. § 2254(d)(1); s*ee, e.g.*, *Thaler v. Haynes*, 130 S. Ct. 1171, 1174 (2010)

9    (finding that no decision of the Court clearly established "that a demeanor-based explanation

10   for a peremptory challenge must be rejected unless the judge personally observed and recalls

11   the relevant aspect of the prospective juror's demeanor"); *Carey v. Musladin*, 549 U.S. 70,

12   77 (2006) (finding that no decision of the Court clearly established "the potential prejudicial

13   effect of spectators' courtroom conduct"); *see also Mirzayance*, 129 S. Ct. at 1413-14 ("[I]t

14   is not an unreasonable application of clearly established Federal law for a state court to

15   decline to apply a specific legal rule that has not been squarely established by this Court.")

16   (internal quotation marks omitted).

17   Furthermore, the Supreme Court has held that the Eighth Amendment bars the

18   admission of a victim's family members' opinions about the appropriate sentence in a capital

19   case.  In *Booth*, the Court held that introduction of a victim impact statement during the

20   sentencing phase of a capital case violated the Eighth Amendment.  482 U.S. at 509.  In

21   *Payne*, the Court overruled *Booth*, in part, holding that the Eighth Amendment does not erect

22   a *per se* barrier to the admission of all victim impact evidence.  501 U.S. at 827.  However,

23   the *Payne* decision retained *Booth*'s prohibition on admitting "characterizations and

24   opinions" from the victim's family "about the crime, the defendant, and the appropriate

25   sentence."  *Id.* at 830 n.2; *see also Booth*, 482 U.S. at 508-09 ("The admissions of these

26   emotionally charged opinions as to what conclusions the jury should draw from the evidence

27   clearly is inconsistent with the reasoned decisionmaking we require in capital cases.").

28   Given this general prohibition on victim testimony regarding the "appropriate sentence" for

1    a capital defendant, the Court cannot say that the Arizona Supreme Court's failure to

2    recognize an exception for "favorable" sentencing recommendations constituted an

3    unreasonable application of *Booth* and *Payne*.

4        **F.    Cumulative Error**

5        In Claim 13, Petitioner alleges that was he was prejudiced by the cumulative effect

6    of errors committed during his guilty plea and sentencing hearings.  Respondents contend

7    that the claim was never presented in state court and therefore is procedurally defaulted

8    because Petitioner has no available state court remedies.  Petitioner counters that he

9    exhausted the claim by identifying the individual errors in state court, thereby affording the

10   court an opportunity to consider his claim of cumulative error.  The Court disagrees and

11   concludes that Petitioner failed to fairly present his cumulative error claim in state court.

12   *See, e.g.*, *Jimenez v. Walker*, 458 F.3d 130, 148-49 (2d Cir. 2006) (finding cumulative error

13   claim not properly exhausted).  Petitioner alleges neither cause and prejudice nor a

14   fundamental miscarriage of justice to excuse the default.  Therefore, the claim is barred.

15       The claim is also meritless.  "Because there is no single constitutional error in this

16   case, there is nothing to accumulate to the level of a constitutional violation."  *Mancuso v.*

17   *Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

18   **V.    REMAINING CLAIMS**

19       **A.    Ineffective Assistance of PCR Counsel**

20       In Claim 6, Petitioner alleges that he was denied the effective assistance of counsel

21   during his state post-conviction proceedings.  However, there is no constitutional right to

22   counsel in state collateral review proceedings.  *See Coleman*, 501 U.S. at 752 (citing

23   *Pennsylvania v. Finley*, 481 U.S. 551 (1987)); *see also Martinez*, 132 S. Ct. at 1315

24   (declining to decide whether a prisoner has a right to effective counsel in collateral

25   proceedings which provide the first occasion to raise a claim of ineffective assistance at trial).

26   Where there is no right to counsel there can be no deprivation of effective assistance of

27   counsel. *Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982). Consequently, Petitioner cannot

28   claim constitutionally ineffective assistance of counsel in state post-conviction collateral

1   proceedings.  *See Coleman*, 501 U.S. at 752; *Campbell v. Wood*, 18 F.3d 662, 677 (9th Cir.

2   1994) (en banc).  Further, this claim is not cognizable: "The ineffectiveness or incompetence

3   of counsel during Federal or State collateral post-conviction proceedings shall not be a

4   ground for relief in a proceeding arising under section 2254."  28 U.S.C. § 2254(I).  For these

5   reasons, Petitioner's request for evidentiary development of Claim 6 is denied.

6           **B.      Challenges to Arizona's Death Penalty**

7           In Claims 14-26, Petitioner asserts various challenges to Arizona's capital sentencing

8   statutory scheme.  Respondents assert that some were not properly exhausted in state court

9   and are now procedurally barred.  Regardless, the Court will address the claims because each

10  is plainly meritless.  *See* 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. at 277.

11          Petitioner asserts that the death penalty is categorically cruel and unusual punishment

12  (Claim 15), but acknowledges that the Supreme Court held otherwise in *Gregg v. Georgia*,

13  428 U.S. 153, 187 (1976).

14          Petitioner contends that Arizona's capital sentencing scheme fails to sufficiently

15  channel the sentencer's discretion (Claim 14), provide an opportunity to "death qualify" the

16  sentencing judge (Claim 17), provide objective standards for weighing aggravation and

17  mitigation (Claim 18), require the cumulative consideration of all mitigating evidence (Claim

18  20) and proportionality review (Claim 25), and require the prosecution to obtain probable

19  cause findings for aggravating factors at the indictment stage (Claim 26) and to prove that

20  death is the appropriate sentence (Claim 21).  He further argues that Arizona law

21  unconstitutionally requires a death sentence if no mitigating circumstances are found (Claim

22  16), requires a defendant to affirmatively prove that his life should be spared (Claim 19),

23  requires that mitigating factors be proven by a preponderance of the evidence (Claim 23), and

24  provides unbridled discretion for prosecutors to seek the death penalty (Claim 24).  In

25  addition, he asserts that the (F)(6) "heinous, cruel, or depraved" aggravating factor fails to

26  genuinely narrow the class of offenders eligible for the death penalty (Claim 22).

27          Rulings of both the Ninth Circuit and the United States Supreme Court have upheld

28  Arizona's death penalty statute against allegations that particular aggravating factors,

1  including the (F)(6) factor, do not adequately narrow the sentencer's discretion.  *See Jeffers*,

2  497 U.S. at 774-77; *Walton v. Arizona*, 497 U.S. 639, 652-56 (1990), *overruled on other*

3  *grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *Woratzeck v. Stewart*, 97 F.3d 329, 334-35

4  (9th Cir. 1996).  The Ninth Circuit has also explicitly rejected the contention that Arizona's

5  death penalty statute is unconstitutional because it "does not properly narrow the class of

6  death penalty recipients."  *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).

7      In *Walton*, the Supreme Court rejected the argument that "Arizona's allocation of the

8  burdens of proof in a capital sentencing proceeding violates the Constitution."  497 U.S. at

9  651.  *Walton* also rejected the claim that Arizona's death penalty statute is impermissibly

10  mandatory and creates a presumption in favor of the death penalty because it provides that

11  the death penalty "shall" be imposed if one or more aggravating factors are found and

12  mitigating circumstances are insufficient to call for leniency.  *Id.* at 651-52 (citing *Blystone*

13  *v. Pennsylvania*, 494 U.S. 299 (1990), and *Boyde*, 494 U.S. at 370); *see also Marsh*, 548 U.S.

14  at 173-74 (relying on *Walton* to uphold Kansas's death penalty statute, which directs

15  imposition of the death penalty when the state has proved that mitigating factors do not

16  outweigh aggravators); *Smith*, 140 F.3d at 1272 (summarily rejecting challenges to the

17  "mandatory" quality of Arizona's death penalty statute and its failure to apply a beyond-a-

18  reasonable-doubt standard).  In addition, the Supreme Court has held that a capital sentencer

19  "need not be instructed how to weigh any particular fact in the capital sentencing decision."

20  *Tuilaepa v. California*, 512 U.S. at 979.

21      Prosecutors have wide discretion in making the decision whether to seek the death

22  penalty.  *See McCleskey v. Kemp*, 481 U.S. 279, 296-97 (1987); *Gregg*, 428 U.S. at 199

23  (pre-sentencing decisions by actors in the criminal justice system that may remove an

24  accused from consideration for the death penalty are not unconstitutional).  In *Smith*, the

25  Ninth Circuit rejected the argument that Arizona's death penalty statute is constitutionally

26  infirm because "the prosecutor can decide whether to seek the death penalty." 140 F.3d at

27  1272.

28      With regard to probable cause for aggravating factors, the Supreme Court has held

- 75 -

that facts constituting the elements of an offense rather than just a sentencing enhancement must be charged in a federal indictment. *See Jones v. United States*, 526 U.S. 227, 252 (1999). However, the Fifth Amendment Due Process Clause does not incorporate the same requirements upon state criminal prosecutions by virtue of the Fourteenth Amendment. *See Hurtado v. California*, 110 U.S. 516, 538 (1884); *Branzburg v. Hayes*, 408 U.S. 665, 688 n.25 (1972). And the Arizona Supreme Court has expressly rejected the argument that *Ring* requires that aggravating factors be alleged in an indictment and be supported by probable cause. *McKaney v. Foreman*, 209 Ariz. 268, 270, 100 P.3d 18, 20 (2004). Petitioner cites no authority to the contrary.

Nor has Petitioner cited authority that he was entitled to voir dire the sentencing judge. Although the Constitution requires that a defendant receive a fair trial before a fair and impartial judge with no bias or interest in the outcome, *see Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997), trial judges, like other public officials, operate under a presumption that they properly discharge their official duties. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996); *see also State v. Perkins*, 141 Ariz. 278, 286, 686 P.2d 1248, 1256 (1984) (trial judge is presumed to be free of bias and prejudice). The presumption of regularity applies absent clear evidence to the contrary. *See Armstrong*, 517 U.S. at 464; *see also State v. Rossi*, 154 Ariz. 245, 248, 741 P.2d 1223, 1226 (1987) (mere possibility of bias or prejudice does not entitle a criminal defendant to voir dire the trial judge at sentencing). Petitioner made no allegation of bias or prejudice when he raised this issue before the Arizona Supreme Court and makes no such allegation here.

Finally, there is no federal constitutional right to proportionality review of a death sentence, *McCleskey*, 481 U.S. at 306 (citing *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984)), and the Arizona Supreme Court discontinued the practice in 1992, *State v. Salazar*, 173 Ariz. 399, 417, 844 P.2d 566, 584 (1992). The Ninth Circuit has explained that the interest implicated by proportionality review—the "substantive right to be free from a disproportionate sentence"—is protected by the application of "adequately narrowed aggravating circumstance[s]." *Ceja*, 97 F.3d at 1252.

1

### C.      Lethal Injection Protocol

2        In Claim 27, Petitioner alleges that Arizona's lethal injection protocol constitutes cruel

3  and unusual punishment.  The Arizona Supreme Court rejected this claim.  *Sansing I*, 200

4  Ariz. at 361, 26 P.3d at 1132.  Petitioner does not assert how this ruling conflicts with or

5  unreasonably applies controlling Supreme Court law.  *See Baze v. Rees*, 553 U.S. 35 (2008).

6  Moreover, the Ninth Circuit has concluded that Arizona's lethal injection protocol does not

7  violate the Eighth Amendment.  *Dickens v. Brewer*, 631 F.3d 1139 (9th Cir. 2011).

8

### D.      Length of Time on Death Row

9        In Claim 28, Petitioner asserts that inordinate delay in carrying out his sentence

10  violates his rights under the Eighth Amendment.  However, the United States Supreme Court

11  has never held that lengthy incarceration prior to execution constitutes cruel and unusual

12  punishment.  *See Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J.,

13  discussing denial of certiorari and noting the claim has not been addressed); *Thompson v.*

14  *McNeil*, 129 S. Ct. 1299 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of

15  certiorari; Thomas, J., concurring, discussing *Lackey* issue).  Circuit courts, including the

16  Ninth Circuit, have also held that prolonged incarceration under a sentence of death does not

17  violate the Eighth Amendment.  *See McKenzie v. Day*, 57 F.3d 1493, 1493-94 (9th Cir. 1995)

18  (en banc); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d

19  1025, 1028 (10th Cir. 1995).

20

### E.      Clemency Proceeding

21        In Claim 29, Petitioner alleges that his constitutional rights will be violated because

22  he will not receive a fair clemency proceeding.  In particular, he alleges the proceeding will

23  not be fair and impartial based on the Clemency Board's selection process, composition,

24  training and procedures, and because the Attorney General will act as the Board's legal

25  advisor and as an advocate against Petitioner.

26        This claim is not cognizable on federal habeas review.  Habeas relief can only be

27  granted on claims that a prisoner "is in custody in violation of the Constitution or laws or

28  treaties of the United States."  28 U.S.C. § 2254(a).  Petitioner's challenge to state clemency

procedures and proceedings does not represent an attack on his detention—i.e., his conviction or sentence—and thus does not constitute a proper ground for relief. *See Franzen v. Brinkman*, 877 F.2d 26, 26 (9th Cir. 1989) (per curiam); *see also Woratzeck v. Stewart*, 118 F.3d 648, 653 (9th Cir. 1997) (per curiam) (clemency claims are not cognizable under federal habeas law).

## CONCLUSION

Petitioner has failed to show entitlement to habeas relief on any of his claims.  In addition, the requested evidentiary development of Claims 1, 2, 3, and 6 is neither required nor warranted.

## CERTIFICATE OF APPEALABILITY

Rule 22(b) of the Federal Rules of Appellate Procedure provides that an applicant cannot take an appeal unless a certificate of appealability has been issued by an appropriate judicial officer.  Rule 11(a) of the Rules Governing Section 2254 Cases provides that the district judge must either issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  If a certificate is issued, the court must state the specific issue or issues that satisfy 28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

The Court finds that reasonable jurists could debate its resolution of Claims 1, 2, 7, 8, and 12.  For the reasons stated in this order, the Court declines to issue a COA with respect to any other claims or procedural issues.

Based on the foregoing,

**IT IS ORDERED** that Petitioner's Petition for Writ of Habeas Corpus (Doc. 35) is **DENIED**.  The Clerk of Court shall enter judgment accordingly.

1    **IT IS FURTHER ORDERED** that Petitioner's Motion for Evidentiary Development

2  (Doc. 53) is **DENIED**.

3    **IT IS FURTHER ORDERED** that the stay of execution entered by the Court on May

4  26, 2011 (Doc. 7) is **VACATED.**

5    **IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as

6  to the following issues:

7    Whether Claim 1—alleging that Petitioner is entitled to relief based on *Ring* error—is without merit;

8

9    Whether Claim 2—alleging that trial counsel performed ineffectively with respect to the investigation and presentation of mitigating evidence—is without merit;

10

11    Whether Claim 7—alleging that the state courts violated Petitioner's rights by applying a "causal nexus" test to his mitigating evidence—is without merit;

12    Whether Claim 8—alleging that Petitioner's plea was not knowing, intelligent, or voluntary—is without merit; and

13

14    Whether Claim 12—alleging that the state court violated Petitioner's rights by refusing to consider the victim's daughter's recommendation of leniency as a mitigating factor—is without merit.

15

16    **IT IS FURTHER ORDERED** that the Clerk of Court forward a courtesy copy of

17  this Order to the Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, AZ

18  85007-3329.

19

20    DATED this 7th day of February, 2013.

21

22

23  _____
                    Susan R. Bolton
                 United States District Judge

24

25

26

27

28